WISECARVER & STONE, Appellee, v. THE CHICAGO, ROCK ISLAND & PACIFIC RAILWAY COMPANY, Appellant.

Railroads: SHIPMENT OF LIVE STOCK: DELAY: DAMAGES: EVIDENCE: IN-STRUCTIONS. Instructions must be read with respect to the testimony and not with reference to an abstract proposition. In the instant case, involving a claim of damages for delay in the shipment of stock, the evidence showed that delivery to the connecting carrier could only be effected by presentation of the bill of lading, and that the same was presented to a transfer company recognized as the agent of the connecting line, which unloaded, watered and fed the stock, a customary duty of the initial company, causing delay in shipment. No negligence was charged against the connecting carrier but the case turned on the sufficiency of the evidence to show proper and timely delivery to the transfer company. *Held,* that instructions charging that to constitute delivery the stock must have passed to the control of the connecting line and that so long as any act remained to be performed by the initial carrier there was not a complete delivery, and that the court assumed that the initial company could not escape liability without showing timely delivery to the connecting line, and overlooked the fact that it was not responsible for the acts of the transfer company, were not prejudicial but fairly presented defendants case as disclosed by the evidence.

Same: DUTY TO FEED AND WATER STOCK. In the absence of a custom it is the duty of the carrier of live stock last receiving the same for through shipment during the twenty-eight hour period, to feed and water the same as required by statute; but where it has become the established custom for the initial carrier to perform this duty before delivering the stock to the connecting line, it is chargeable with any damages, the result of delay, by neglect or failure to do so.

Same: CONTRACT LIMITATION OF CARRIERS LIABILITY. A contract for the shipment of live stock which provides that the same it not to be transported or delivered at the destination within any specified time, nor in time for any market; that the shipper shall assume the risk of care and the expense of feeding and watering at all

times and places; and shall load and unload the same at his own expense is invalid, and will not relieve the carrier from damages for the negligent delay in shipment.

Carriers of live stock: LIABILITY FOR INJURY.  A carrier of live stock whose negligent delay in transportation causes or contributes to injury of the stock, even though this does not develop until after it has delivered the same to a connecting carrier, is liable for the injury.

Same: DAMAGES: INSTRUCTION.  A carrier of live stock is liable for all damages which naturally and proximately result from its failure to perform its duty, whether apprehended by it or not.

*Appeal from Jefferson District Court.*—HON. D. M. ANDERSON, Judge.

TUESDAY, FEBRUARY 9, 1909.

ACTION to recover damages for negligent delay in the transportation of a carload of horses, resulting in injury to the plaintiffs as owners by reason of the depreciation in value and loss of market.  There was a verdict for the plaintiff, and from the judgment thereon defendant appeals.—*Affirmed.*

*Leggett & McKemey, Carroll Wright* and *J. L. Parrish,* for appellant.

*R. J. Wilson* and *E. R. Smith,* for appellee.

DEEMER, J.—The written contract between plaintiffs and the defendant for the transportation of a carload of horses belonging to plaintiffs from Winterset to Des Moines, destined for East St. Louis, provided that the liability of the defendant company should terminate upon delivery by it of said car to its connecting carrier.  No connecting carrier was named in the contract, but the car was described as "consigned to John S. Bratton, care

of Wabash Railway, National Stockyards, East St. Louis, Illinois." Plaintiffs seem to have understood that the car would be forwarded from Des Moines to East St. Louis over the Wabash Railway. But as the defendant company and the Wabash Company had no connecting track in Des Moines, the car was delivered by the defendant upon the usual track of the Des Moines Union Railway Company, a common carrier of freight having connections both with the defendant company and the Wabash Company, thus forming a connecting link in the line of transportation from Winterset to St. Louis. If any negligent delay occurred in the transportation by the defendant company, it consisted in failure to put the car into the full control of the Des Moines Union Company with sufficient diligence; and with reference to such charge of negligent delay, the undisputed facts as disclosed by the record are that the car left Winterset about 2, o'clock p. m. of the day the horses were received, and the agent of the Rock Island Company said there was a Wabash train leaving Des Moines at about 9 or 9:30 o'clock the next morning. The usual time consumed in making a shipment from Winterset via Des Moines over the Rock Island and Wabash to East St. Louis was something over thirty hours. The car reached Des Moines about 7:30 p. m. November 27th, and as soon as it could be switched, was placed upon what was known as the Des Moines Union Transfer, a track belonging to, or at least used jointly by the Rock Island, the Des Moines Union, and Great Western Railway Companies. It is claimed that this was for the purpose of having the Des Moines Union take and switch it over to the Wabash tracks, that it might be received by the latter company. This switching to the transfer tracks was accomplished at about 8:50 or 9 o'clock in the evening, and when it had been accomplished, the Rock Island yard clerk called up the Des Moines Union office by telephone, and asked for the yardmaster. Being informed that he was

out, he asked the operator if he would tell the yardmaster that the car was on the transfer, which the operator promised to do. This yard clerk gave no other notice, gave no one the bill of lading that evening, but left it in the Rock Island freight office in Des Moines. His telephone communication was with the operator in the office of the yardmaster of the Des Moines Union Railroad Company. The duties of the operator are not shown, except as hereinafter stated; but it does appear that one Wilson was the local freight agent in Des Moines of the Des Moines Union, the Wabash, and the Milwaukee Railway Companies. His hours were from 7:30 a. m. to 6 p. m. There were two yardmasters who had charge of this track, owned or used jointly by the companies mentioned; one in the daytime and the other at night. The freight agent had no knowledge of the car being on the transfer track until 9:25 in the morning of November 28th, when the bill of lading was delivered to him by the Rock Island Company. It does not appear that the yardmaster had any knowledge thereof until about that time, although the operator in the yardmaster's office, whoever he may have been, had knowledge of the presence of the car the night before.

When Wilson, the local freight agent of the Des Moines and the Wabash Companies, received the bill of lading from the Rock Island Company the morning of the 28th, he discovered that the horses had been loaded the previous afternoon, had not been unloaded, fed or watered, and had already been upon the road something like nineteen hours. We now quote Wilson's testimony regarding the disposition of the car:

The bill showed that the car of horses had been on the cars somewhere about nineteen hours. It was immediately delivered to the Agar Packing Company to be fed and rested. I ordered the horses fed and watered and rested by the Agar Company stockyards people, which was done, and the horses reloaded in the same car on the morning of

November 29th, at 9 a. m. The first train that left Des Moines on the Wabash after the receipt of the billing from the Chicago, Rock Island & Pacific Railway Company covering this car was at 10 a. m. November 28th. The reason we did not send the car out on the Wabash on the morning of the 28th was that they had already been on the car about nineteen hours, and we didn't have sufficient time to get the shipment to its destination, or to the next feeding station, until the twenty-eight-hour limit was up, and I thought it was advisable to hold them and give the necessary feed and rest until the next day. . . . The next morning, when I got the bill, I had the horses taken out and unloaded. There was no reason why I could not have put them in the train, only I wanted to feed them. According to my information they had at that time been in the car from 2 o'clock the day before. I don't know how long they had been on our tracks. I fed them, and had them rested, and then started them to St. Louis. We had only one through train over the road each day. There was no other train that day by which they could have been forwarded to St. Louis. The first I knew of this was when I got the waybill at 9:25 in the morning.

The horses were sent out on the morning of November 29th upon the first train upon which they could be sent after being unloaded, fed and watered, and by reason of the delay in Des Moines the injury occurred. As is well known, the law requires that stock shall not remain more than twenty-eight hours without being unloaded, fed, and watered, and it is manifest that this was required at some place along the line of shipment. The usual running time between Des Moines and St. Louis over the Wabash is eighteen hours. It is apparent then that the horses had to be unloaded, fed and watered at some time during their transportation. It is claimed by plaintiff that according to a long-existing custom this duty devolved upon the Rock Island Company, and that by reason of the law and of a prevailing custom, defendant's responsibility did not cease until it had unloaded, fed and watered the

stock, and turned over the bill of lading or waybill for the stock to Wilson, who was the local joint freight agent of the Des Moines Union and the Wabash Companies, while on the other hand, defendant contended that its responsibility ceased when it set the car in upon the transfer track, and notified the agent of the Des Moines Union of the presence of the car upon the transfer track.

We now quote all the testimony on either side with reference to this matter. Wilson, the joint agent testified as follows:

Q. You may state, Mr. Wilson, how a carload of horses shipped from the initial point, say Winterset, over the Rock Island Road to Des Moines, and to be there transferred to the Wabash for transportation to St. Louis over the Wabash Line, you may state what the ordinary and customary manner of delivery to the Wabash Road is in Des Moines, if you know? A. The usual custom is that when a car of horses is received from connecting lines of the Rock Island en route for shipment to St. Louis via Des Moines and the Wabash Railroad, if they are to be fed at Des Moines, the line bringing them into Des Moines delivers them to the Agar stockyards soon after they arrive in Des Moines, and then immediately delivers the bill covering that shipment to the Des Moines Union freight office, and then the Des Moines Union sends a switch engine over to the Agar stockyards, and as soon as the stock is fed and rested, gets them on the first Wabash train that goes out for St. Louis. Q. Has that been customary during the four years of your agency and control of the Des Moines Union? A. It has been the custom for the last four or five years. I remember the carload of horses in question. It was delivered on the connecting track between the Des Moines Union and Rock Island. Q. Why didn't you move that car? A. We moved it as soon as we received the bill. I received the waybill covering this car of horses about 9:25 a. m., November 28, 1905, from the Chicago, Rock Island & Pacific. We then had the car of horses in our possession. Q. Do you feed stock at all shipped from Des Moines to St. Louis in ordinary reasonable transportation? A. No, sir; we do not.

Q.   When would this car pass to the Des Moines Union?
A.   Whenever we get the bill covering the shipment, we
would handle it then.   Q.   Does the Des Moines Union
ever handle a car until the bill of lading is handed to you,
or handle a car until the bill of lading between the Des
Moines Union or any other road, and especially this de-
fendant?   A.   Not through cars.   Q.   When a car comes
in over the Rock Island for transportation to St. Louis,
what is the first thing that is done with the car, and by
whom, according to the customary manner of handling
freight there in Des Moines?   A.   The line on which the
car arrives in Des Moines.   It is the custom for them to
deliver it to the connecting track for the Des Moines Un-
ion, and then the Des Moines Union, after they have the
bill for it from that road, the Des Moines Union sends
their engine up to the connecting track, and gets the car
and puts it in position to be forwarded.   Q.   I will ask
you to state when a delivery is made of an incoming car
in Des Moines to go out over a forwarding line, where is
the feeding, if any, done, and by whom is it done, and
does it precede the bill of lading?   A.   The line bringing
the car into Des Moines would arrange for the feeding
with the stockyards, or somebody else, and then the receiv-
ing line of road would go out there and get the car from
where it was fed, if it was the stockyards, and forward it.
Q.   Are these stockyards maintained in Des Moines?   A.
Yes, sir.   Q.   Where all these railroads have an oppor-
tunity to feed before delivering to the Des Moines Union?
A.   The stockyards are maintained and feed all the lines
that reach them, and the Rock Island reaches them.   Q.
Have you ever handled a carload of horses where the horses
have not been previously fed by the line bringing them
into the city before they had been delivered to you, and
before the waybill had been delivered to you?   A.   No,
sir.   Q.   And is the instance of this car the first that
you have known where the feeding was not done before the
bringing and delivering of the waybill to you?   A.   It is
the only case that I recall.   The waybill was delivered to
me at 9:25, November 28th.   Q.   Then was when you
took control of the car?   A.   At 9:25 a. m.   There was
a freight departed at 10 a. m.   It is the custom when a
car is delivered to us and a waybill, to give a receipt for

the waybill.  Q.  Did you execute to the Rock Island Company, on the morning of the 28th, a receipt for this waybill?  A.  I don't know that I personally gave a receipt.  There was one given.  I saw it.  During the four years I have been connected with the company there has never been any specified delivery recognized by the Des Moines Union except the delivery of the waybill.  . . . I don't know what time that car came onto our tracks or into our possession.  I know that my office was not notified until we got the bill of lading, but I was not there.  I simply know that I have no record of it.  Of course I could not say positively whether they were notified or not. I don't know when they were put in our possession.  Q. When does the Union attach its engine and enter upon the delivery of a car?  A.  A car is consigned over, as this car was, when we get the waybill.  Q.  When do you first, if ever, take control of a car?  A.  When we get the billing.  Q.  Now, Mr. Wilson, when the Rock Island brought that car from Winterset into Des Moines, whose duty was it to take that car to the stockyards and have them fed?  A.  It is the Rock Island's duty.  Q.  And when the bill of lading was delivered to you at 9:25 the next morning, where, in the ordinary or customary delivery or taking charge of the car, would you have found it?  A.  At the Agar Packing Company's stockyards.  Q. And that is where you would have taken control of the car first for the transfer to the Wabash?  A.  Yes, sir. Q.  Now, Mr. Wilson, I want to ask you if anybody about your office has authority to accept any other kind of delivery than the delivery to which you have testified to here in our presence, in your absence?  A.  No, sir.  Q. Now you say that in your judgment it was a wise and proper thing to do when you first got control of that car the next morning by delivery of the waybill—in your judgment it was the proper thing to feed and rest the animals? Now you may state to the jury what was best in your judgment.  A.  According to law, as I understand it, it is a violation of the law to keep animals or horses inclosed in a car a longer period without feed.

Defendant's evidence in respect to this matter was as follows:  Nesbit, who was its yard clerk at the time in

question, testified as follows with reference to the delivery:

I remember handling a car of horses that came into the Rock Island yards on the Rock Island train from Winterset in November, 1905. The car came in at 7:30 in the evening. Each car is handled with a waybill, which the conductor brings, and from the waybill the switching list is made up, and from that you know where the car is going. This car came in, and I took and marked on the side of the car so the switchman could switch it. I marked it, 'For St. Louis by the Wabash.' It was an open stock car, and you should see that horses were in it. The car was taken and placed on the Des Moines Union Transfer, so that the Des Moines Union could get this car and deliver it to the Wabash. I notified the operator at the Des Moines Union, and wrote it down in the book at 9 p. m. I notified him by telephone. I first asked for the yardmaster, and he said he wasn't in, and I asked the operator if he would tell him [the yardmaster] that this car was on the transfer, and he said, 'Yes, sir,' and I said 'All right.' I told him it was a car of horses, and had been placed on the transfer, and where it was going. I told him it was a car of horses for St. Louis by the Wabash. Exhibit D is the record kept by me in my official capacity in the employ there for the Rock Island. The record was made at the time. The record I made of this particular car of horses which came in from Winterset on November 25, 1905, was 'SWS 1801, horses from Winterset for East St. Louis.' This is the way we always handled transfers of this kind during the two years or more I was in the employ of that company. This record as to the number of the car was made from the switching list of the conductor and the waybill. This is the manner in which I located this particular car. The car contained horses. . . . I didn't notify anybody of the arrival of this car personally. I didn't deliver any paper to anybody. I didn't make out the bill Exhibit C, and I can not tell you who did make it out. I didn't have that bill in my possession. I didn't know what became of the one I had. With reference to the marks I put on this car, I indicated on the car in substance what I telephoned to the operator

in the yardmaster's office at the Des Moines Union. This is the way they handled the cars at that time, through chalk marks. This car was handled no different from the way we handled all cars at that time. The Des Moines Union always received these cars with chalk marks on them. This car was in the Rock Island switchyards, when I put the chalk marks on it. They were on there for the benefit of the Rock Island switchman. Exhibit C was not made in the Rock Island office or in the freight office. I don't know where the original waybill is. I didn't see it after I took it to the Rock Island freight office. That is not the original freight bill, but probably was copied from it. These chalk marks on the car was for the use of the Des Moines Union as well as the Rock Island switchman. They would not handle a car without marks on it. That is all they had to go by at that time. Anybody whose duty it became to handle it in Des Moines would be guided by these chalk marks. The Rock Island switchman, or any other switchman, would be governed by these marks.

Osborne, a switchman for the defendant, testified with reference to this as follows:

There was a car of horses came on the Rock Island from Winterset, Iowa, on the evening of November 27, 1905. I handled it by the chalk marks that were on the car. It was marked 'St. Louis via Wabash, 11-27-1905.' I placed it on the transfer on which I ordinarily place cars of this kind. The only way I had of knowing where to switch the car was the chalk marks that were on it, and it was for the employes of the Des Moines Union Railway Company, so that they could switch by these marks. In transferring these cars it was the custom to switch them according to these chalk marks. I never knew of the Des Moines Union refusing any cars with these marks on them. After I placed this car on the transfer I notified Mr. Nesbit. That was part of my duty when I had cars loaded with live stock. I made a record of handling that car that evening. It was handled at 8:50. Exhibit E is the record made on that car. The record I made was 'Car No. 1801, initials SWS.'

Plaintiff's damages, as alleged, consisted in injury to the horses by reason of being longer on the way than necessary, and also in loss of the market on Thursday, the 30th; the next market day being the Monday following, when some of the horses were sold at a considerably lower price than they would have brought on Thursday, while others, on account of being out of condition as a result of the unnecessarily long detention in the cars, were carried over at an expense until a later date, and sold at a further loss.

I.   Remembering that there was no charge of any delay on the part of the Wabash Company after it in fact received the car of horses, save as the delay of the Des Moines Union was attributed to it, that Wilson was the joint agent of the Des Moines Union and the Wabash Railway Companies, and that there was no fault upon the part of either the Des Moines Union or the Wabash Companies, unless what the defendant did in setting the car upon the transfer track and notifying the operator in the yardmaster's office constituted a delivery to the connecting carrier, we go now to the instructions.   It is true that in many of the instructions the trial court told the jury that the defendant was required to show seasonable delivery to the Wabash Company, but it also gave among others the following:

1. RAILROADS: shipment of live stock: delay: damages: evidence: instructions.

(9) It appears from the evidence that the horses in question were delivered to the defendant at Winterset, Iowa, for shipment to Des Moines, Iowa, and to be delivered in said city to the Wabash Railroad Company, and to constitute such delivery of the car and horses in question, they must have been passed by the defendant into the control of said Wabash Railroad Company, and so long as any essential act remained to be done by the defendant company to complete said delivery, the same could not be said to be complete.   Hence, if you find from

the evidence that the customary delivery, as between the defendant and the Wabash Railroad Company, constituted, among other things, the delivery of a copy of the waybill of such shipment, and if you further find that the delivery of a copy of the waybill constituted a part of such delivery, and until it was presented and passed to the Wabash Company, there was no complete delivery of the car in question in behalf of the defendant, and if the delay, if any, in the delivery of the waybill was the cause of the unreasonable delay, if any, of said stock, then the defendant would be liable for any damages the plaintiff may have sustained thereby, growing out of the fact that said horses were unreasonably delayed, if they were, in their transportation to their destination.

(10) On the other hand, if you find from the evidence that it was the custom of the defendant company and the Wabash Railroad Company that delivery from defendant to said Wabash Company was done by delivering said car upon the transfer track between the defendant company and the Des Moines Union Railroad, and that said delivery was completed by such delivery upon said transfer track, and noting upon said car in chalk certain directions for the switching crews, and by notifying the operator at the Des Moines Union office of so placing said car, and you find that the freight agent of the Des Moines Union Railway Company was also the agent of the Wabash Railroad Company, and if you find the facts established as herein stated, and if you further find that the car and horses in question were so handled and transferred, and that upon arrival at Des Moines they were placed upon said transfer track, and that chalk marks were placed upon the car as a guide to the switching crews, and that some one in charge at the freight office of the Des Moines Union and Wabash Railroads was notified thereof, and if you find that no further act of defendant company was necessary to their delivery to the Wabash Railroad Company, and that all this was done without unreasonable delay, then the defendant company has complied with the contract, and done all that was required of it concerning said shipment and would not be liable herein for damages to plaintiff, and your verdict should therefore be for defendant.

(11) If you find from the evidence that the customary

delivery of stock from Winterset, Iowa, over the defendant company to the Wabash Company at Des Moines, Iowa, required that the horses should first be taken to the stockyards, and there fed and reloaded, and then delivered to the Wabash Company before its duty attached, and the defendant became relieved of any duty thereto, and if you find further that the ordinary course of transportation required all this to be done at a time before and sufficient to allow of said car going out on the first regular train on the Wabash, and if you further find that the defendant's negligence in these respects caused or contributed to an unreasonable delay in the arrival of said horses at the St. Louis stockyards, then the defendant would be liable for all approximate damages the plaintiffs may have suffered in consequence of said negligence, if such negligence has been established.

(13) You are instructed that said agreement or contract which was signed by plaintiff, providing against any liability by the railway company for any loss or injury to the horses beyond its own line of railway, is a valid and proper contract, and binds the parties. And if you should find from the evidence that the horses of the plaintiffs, which were shipped by them over the defendant's railway under said live stock contract, were in any way, or from any cause whatever, delayed or otherwise injured after said horses had passed beyond the line of the defendant's railway, and if you further find that the defendant company was not responsible for such delay or injury, then the defendant would not be liable herein to plaintiffs, and your verdict should be accordingly.

A review of the testimony shows that both parties treated delivery to the Des Moines Union Company as equivalent of a delivery to the Wabash Railway, and that no one was complaining of any delay on the part of the Wabash Company, save as it was responsible for the acts of the Des Moines Union. It shipped the stock as soon as received from the Des Moines Union, and there was no question regarding the time or place of the delivery of the stock by the Des Moines Union to the Wabash Company. The Wabash sent the stock out on its first train after the

stock was delivered to it, and there is no complaint of any delay on its part thereafter. Now the instructions quoted fully relieved defendant from responsibility in the event it delivered the stock to the Des Moines Union Company on the evening of November 27th. If there was not a complete delivery at that time to the Des Moines Union Company, but delivery was made according to custom on the next morning at 9:25, then the jury was authorized to find defendant liable. The testimony was all addressed to the delivery to the Des Moines Union Company, and no one claimed that either it or the Wabash Company was responsible unless delivery was made on the evening of the 27th, when the car was set on the transfer track. The instructions should be read with reference to the record quoted; and, when so read, it seems that defendant's rights were fully protected by the tenth, eleventh and thirteenth instructions quoted. We have set forth all the material testimony upon any of the questions at issue so as to have the full record before us. Upon this record it seems that there was nothing in the instructions which could have misled the jury. It is true that the court gave, among others, the seventh and eighth instructions reading as follows:

(7) The defendant in this case, under the provisions of the written contract, was required to transport the car of horses in question to the city of Des Moines, Iowa, and to there make delivery of said car of horses to the Wabash Railroad Company, over which they were to pass to St. Louis stockyards, and this the defendant was required to do without the negligent handling of said stock, and without unnecessary or unreasonable delay.

(8) The law requires that stock shall not remain in the car more than 28 hours without being unloaded, fed and watered; . . . and if you find that the defendant company delivered the stock in question to the Wabash Company upon the day of its arrival, then the defendant would be in no way liable for any delay occasioned on account of said stock being unloaded, fed and watered at the stock-

yards in Des Moines on the next day.   But if you find
from the evidence that the defendant company did not de-
liver said stock to the Wabash Company until the day fol-
lowing its arrival in Des Moines, and that by such delay it
became necessary for the Wabash Company to then unload,
feed and water said stock in order that the law above re-
ferred to should be complied with, and you further find
that such unloading caused a delay to said stock, and you
further find that such delay was caused by the failure of
the defendant company to deliver said stock to the Wabash
Company with reasonable promptness upon its arrival in
Des Moines, then the defendant would be responsible for
such delay.

But these, when read in connection with the ones here-
tofore quoted, were not likely, in view of the testimony
which we have set forth, to mislead the jury.   The agent of
the Des Moines Union Company was also the agent of the
Wabash Company, and a delivery to him was a delivery to
either or to both companies.   No one claims that there was
any delay on the part of the Des Moines Union Company,
unless there was a delivery of the car to it on the evening
of November 27th.   If there was a delivery at that time,
this delivery was by the instructions treated as having been
made to the Wabash Company.   If the car was not delivered
to either company until the morning of the 28th, then, and
then only, was the jury authorized to find for the plaintiff.
In other words, for the purposes of the case, delivery to the
Des Moines Union Company was treated as the equivalent
of delivery to the Wabash Company, and defendant was not
charged under these instructions with any delay of the Des
Moines Union, the connecting carrier.

The instructions must be construed with reference to
the testimony presented, and not abstractly, or with refer-
ence to some abstract proposition.   When so
2. SAME: duty
to feed and    construed, it is manifest that the only real
water stock.
question in the case was this, Whose duty
was it to feed and water the stock?   They had to be fed

and watered by some one during the course of transportation, and by one or the other of these three companies. In the absence of any custom to the contrary it was the duty of the company last receiving the stock during the twenty-eight-hour period to look after this matter. If by custom, however, that duty was undertaken by the Rock Island Company, the initial carrier before delivery to the next succeeding carrier, and it failed to perform that duty, and in consequence the stock was delayed in shipment, resulting in loss to the shipper, the initial carrier was responsible, and so the court instructed.

Moreover, if, either by law or custom, delivery to the connecting carrier could only be made by presentation of the bill of lading as the testimony tended to show, then as the delivery of the waybill was to the joint agent of the Wabash and Des Moines Union Companies, there was no prejudicial error in instructing regarding the delivery of the waybill to the agent of the Wabash Company. Appellant's counsel assume that the trial court was of opinion that the Rock Island Company could not escape liability, except that it showed timely and seasonable delivery to the Wabash Company, overlooking the fact that there was another connecting carrier for whose acts the Rock Island Company was not responsible. The record does not support this claim; but, if it did, no prejudice resulted to defendant under the facts disclosed when applied to the instructions given. It must be remembered that the Wabash Company did not undertake at any time to unload, feed and water the stock. These duties were performed by the Des Moines Union Company, and no negligence is charged against the Wabash Company with respect thereto. On this issue the Des Moines Union was, for all practical purposes, treated as the Wabash Company. Instruction 13, already quoted, seems to fully cover the objections made by appellant's counsel. The whole case seemed to turn upon the sufficiency of

the Des Moines Union on the evening of November 27th, the facts to show a delivery by the Rock Island Company to and a delivery to that company was treated as the equivalent of a delivery to the Wabash.

II. Among other things, defendant's contract provided: "Second, That the live stock covered by this contract is not to be transported within any specified time, nor delivered at destination at any particular hour, nor in season for any particular market. Fourth. That the second party shall assume all risk and expense of feeding, watering, bedding, and otherwise caring for the live stock covered by this contract, while in cars, yards, pens or elsewhere, and shall load and unload the same at his own expense and risk." With reference thereto the trial court instructed: "(14) The evidence shows that neither member of the plaintiffs' firm accompanied the car of horses in question. The provision of the contract Exhibit A, seeking to impose any duty in this respect upon the plaintiffs, is of no validity or effect, nor can the defendant charge the plaintiffs with any responsibility for such stock by reason of such provision in said contract, and you will therefore consider such provision of said contract for no purpose in this case." In this there was no error. *Powers v. R. R.,* 130 Iowa, 616; *Grieve v. R. R.,* 104 Iowa, 659.

*3. SAME: contract limitation of carriers liability.*

III. Among others the trial court gave the following instruction: "(12) If plaintiffs have established that there was an unreasonable delay in the arrival of the horses in question at the St. Louis stockyards, and if you find that the said horses were injured through neglect in the course of transportation, and that both this unreasonable delay and injury to the stock in the transportation was caused, or materially contributed to, by the defendant, by acts of omission or commission, before there had been a proper and sufficient de-

*4. CARRIERS OF LIVE STOCKS: liability for injury.*

livery of the horses by the defendant to the Wabash Company, then the defendant would be liable for the damages sustained by such unreasonable delay, and for any injury the horses sustained, even though such injury may not have developed until after said horses had passed into the hands of the Wabash Company, or after their arrival at their destination." The effect of this was to hold the defendant liable in the event delay was caused or contributed to by it, even though the injury to the animals may not have developed until the animals passed into the possession of the connecting carrier, or until after they arrived at their destination. In other words, it was held liable for the results of any negligence to which it contributed, although its conduct might not have been the sole cause of the injury. That this is the correct rule, see 6 Am. & Eng. Ency. of Law, 618, and cases cited. *Kinnick v. R. R.,* 69 Iowa, 665. It is a general rule that where two or more persons, either severally, or jointly and severally, contribute to an injury, each is liable for the entire damage sustained. 1 Thompson on Negligence, section 75, and cases cited.

IV. The instruction as to measure of damages reads in this wise: "If you find from the evidence that the plaintiffs are entitled to recover, then you will allow them such sum in damages as they have shown they are fairly entitled to under all the circumstances and the evidence in the case, and in this connection you are instructed that you should allow them the difference between the market value of the horses in question, if they had arrived at the place of destination without unreasonable delay, and the market value of said horses when they did actually arrive at the point of destination. If you find that any of said horses were injured during their transportation, and you find that defendant is responsible therefor, then you will allow plaintiffs such additional sum as the value of such horses were reduced by

5. SAME: damages: instruction.

said injury.   If you further find that there was unreasonable delay in the arrival of said horses at their destination, and that defendant was responsible for such delay, and that by reason thereof the plaintiffs were detained in St. Louis in securing a market for said horses, and that they were at expense for themselves and in keeping said horses until they secured such market, then you will allow them such further sum, as shown by the evidence, that they have expended for their own personal expenses for hotel bills, and for feeding and caring for the horses, until such market was secured, and also for the value of plaintiffs' time and services while detained in St. Louis in seeking a market for said horses, but you will only allow for the damages described in this paragraph after you have found by the evidence, if you do, that plaintiffs could have readily sold said horses in the market if they had arrived at their destination without unreasonable delay.   And in any event you will allow plaintiffs no more, if you allow them anything, than they claim herein."   This is complained of for the reason that, as defendant could not have anticipated such damges, it can not be held liable therefor.   In this there is no merit.   The action is not for breach of contract, but sounds in tort, and in such cases it need not be shown that the damages suffered were in the minds of the parties when the relation of carrier arose.   The carrier was responsible for all such damages as naturally and proximately followed as a result of its failure to perform its duty, no matter whether apprehended by it or not.   This is a fundamental doctrine requiring no citation of authorities in its support.   But see, as closely in point, *Toledo Ry. v. Lockhart,* 71 Ill. 627, and *Balt. Co. v. O'Donnell,* 49 Ohio St. 489 (32 N. E. 476, 21 L. R. A. 117, 34 Am. St. Rep. 579).

We have gone over the record with care, and discover no prejudicial error.   The judgment must therefore be, and it is, *affirmed.*