GULF, COLORADO & SANTA FE RAILWAY COMPANY v.
J. N. PORTER.

Decided March 13, 1901.

**1.—Carrier—Live Stock—Damages.**

See evidence held to support a verdict in the amount of $518.55 for damages in transportation of 128 head of cattle, by delay, rough handling, insufficient food and water, and muddy pens.

**2.—Carrier—Delay—Regular Trains.**

A carrier can not avoid liability for failure to transport cattle within a reasonable time by showing that its regular trains did not connect in time to avoid the delay.

**3.—Carrier—Feeding and Watering Cattle—Pleading—Evidence.**

An allegation in a suit against a carrier for damages to live stock in their transportation, that they were delivered in a damaged condition through defendant's negligence and delay in transporting them, was sufficient to admit evidence as to failure to properly feed and water them; and such evidence was also admissible on the issue made by defendant, that their injury was due to their wild and restless nature, as showing the cause of their restlessness to be the fault of defendant.

Appeal from the County Court of Hill. Tried below before Hon. J. B. Reynolds.

*B. K. Goree* and *J. W. Terry,* for appellant.

*Bledsoe & Bledsoe* and *Wear, Morrow & Smithdeal,* for appellee.

COLLARD, ASSOCIATE JUSTICE.—Suit in the County Court by J. N. Porter for alleged damages to stock cattle while being carried by defendant from Ballinger to Blum, Texas, October 9, 1899, alleging that the cattle were not carried in reasonable time and that they were often jarred and knocked down by rough handling in switching, were confined in muddy pens, unnecessarily unloaded at Brownwood, and six head so badly injured that they were killed or abandoned on the way.

Answer by general demurrer, general denial, and special answer that the cattle had been carefully and expeditiously handled, but that they

were thin and weak when received, and unruly and vicious, and that if injured, the injury resulted from their own condition and fighting propensities. That it was necessary to unload them at Brownwood to make connection with defendant's train to Temple. Defendant also pleaded that it was stipulated in the contract of shipment that the cattle were not to be transported in any specified time, and that plaintiff assumed all risks of injury to the cattle resulting from their disposition; and further that plaintiff agreed to take care of the cattle en route, and if they were injured, it was due to the negligence of plaintiff to properly care for them.

Plaintiiff replied by demurrer and general denial, and specially that any agreement of plaintiff not to hold defendant liable for injuries to the cattle arising from its own negligence is void, and that if the cattle were unruly and were maimed, it resulted from want of proper care of defendant to provide proper pens and water.

Verdict and judgment for plaintiff for $518.55, from which defendant has appealed.

*Opinion.*—1. The court instructed the jury that if injuries to the cattle resulted from the condition or disposition of the cattle, plaintiff would not be entitled to recover; and appellant contends that it was shown by a preponderance of the evidence that at the time of the shipment the cattle were poor and weak, and that plaintiff, notwithstanding, loaded them on the cars for a trip of nearly 300 miles, and that defendant was therefore not responsible.

The shipment consisted of 60 cows and heifers, 20 two-year-old steers, and the rest yearlings or "coming yearlings," except two bulls, 128 head in all. The testimony of plaintiff showed that the cattle were damaged on the trip at $8 per head, or over $1,000, though plaintiiff sued for only $6 per head, $768. He recovered $518.55, an amount less than that sued for, and an amount less than would have been warranted by the testimony. It is not the province of the court to determine the true amount of damages the jury should have allowed. The law leaves that question with the jury, and unless the verdict should be apparently excessive, the court should not interfere. In this case we could not do so. Testimony adduced by the plaintiff shows that he bought the cattle in the country about 30 miles from Ballinger; they were stock cattle and in good condition, not crippled or bruised. He drove them to Ballinger and "they stood the trip nicely." They were loaded on defendant's local freight and carried seventy-five or eighty miles to Brownwood, where they were held in muddy pens sixteen or seventeen hours without sufficient feed and water, and were then reloaded and carried to Temple on a mixed train, a long, tiresome trip, all day and night going the distance, about 100 miles, the train making frequent stops, having the effect to worry the cattle and knock them down. They were not fed at Temple, remained there four hours, and were then

carried to Blum on defendant's road, being eight or nine hours on the way. On arrival at Blum they were in bad condition, skinned up and muddy, all skinned more or less. Six of the cows died during the shipment and three after they were unloaded and received at Blum. Of the six that died on the way, three were left at Brownwood, one died while being unloaded, and two others were killed in the pens at the same place. Plaintiff testified: "They were put in the Santa Fe stock pens at Brownwood and they were in bad shape; it had been raining and they were muddy. The cattle were put in three pens, and the company's employes gave the cattle three bales of hay to each pen, or nine bales to the 128 head of cattle. They filled the troughs in the three pens and went away. I went to the pens about daylight on the morning of the 28th and the cattle were very restless. There was just a little water in the bottom of the troughs. They were crowded around the troughs all trying to get it. Some of them were down, and some of them had been hooked over in the troughs. I hunted up the agent and asked him to put more water and feed in the pens. In the course of an hour he came to the pens and turned on more water in the trough, and put nine more bales of hay in the pens. * * * The cattle quieted down when they were watered and fed. The cattle were watered at the creek, as they were driven in to Ballinger on the evening of the 26th. They had no water from that time until they got the water at Brownwood."

Dave Schley testified for plaintiff that he knew the cattle. "I saw them about two days before they were shipped. They were average cattle, neither fat nor poor. They were in as good flesh as any cattle in that country. I helped to drive them to Ballinger."

M. W. Brigham, witness for plaintiff, testified that he knew the cattle: "I helped to drive them. It took about a day and a half to drive them from the pasture to Ballinger. They were not very troublesome in driving. They were quiet. Their condition was very good when they got to Ballinger. They were stock cattle. The cattle were in good shape."

J. H. Spreadman, witness for plaintiff: "I know the bunch of cattle in question, and saw them when they arrived at Blum. The cattle were in pretty bad shape,—in bad condition. Some of them were dead,—some. were down, some had their necks crooked around." The witness thinks that there were none dead among the yearlings.

T. R. Gannoway, witness for plaintiff, testified that in the condition they were in at Blum they were worth from $10 to $12 per head, and such a lot of cattle in average flesh would have been worth an average of $18 to $20 per head. The cows about $26 per head.

There was testimony adduced by defendant to the effect that the cattle were poor and in bad condition on arrival at Ballinger, and were worth much less than the estimate made by plaintiff's witnesses.

We can not say the verdict was unsupported by the testimony as to failure of defendant to carry the cattle in a reasonable time, nor that it was excessive in amount. The verdict was not for as much as the tes-

timony of plaintiff would have warranted. These questions were for the jury to determine, and while they might have rendered a different verdict for a less amount, it was their province to decide the matters and we can not disturb the finding.

Appellant contends that the delays were absolutely necessary, especially at Brownwood; that the cattle were carried on as soon as the regular trains arrived. Defendant received the cattle for shipment, and it was its duty to transport them in a reasonable time. If the trains did not connect in time to avoid the delay, it can not claim immunity from the consequences on that ground.

It does not appear that the cattle were injured or famished for water as claimed by defendant on arrival at Ballinger. They were watered the evening before arrival. Porter testified that they stood the trip nicely, and were in good condition. It was the morning after they were put in defendant's pens that they were restless for want of water and "feed," and as soon as they were fed they quieted down.

The jury might well have concluded that it was the want of water and sufficient "feed" that caused them to be restless and hook and crowd one another, and not because of their being wild and unruly.

2. Appellant complains that the court submitted as an element of recovery the issue as to whether the cattle had been properly fed and watered. The petition shows that "when the cattle were delivered to plaintiff at Blum they were in bad condition, being bruised and drawn, and were greatly damaged and injured." It is also averred that defendant "agreed and bound itself to transport the same as expeditiously as possible, and in as good condition as possible." These allegations are sufficient to admit proof of the cause of the drawn and damaged condition, and that defendant failed to comply with the obligation to carry the cattle in as good condition as possible; and under the issue so made it might be shown that they were not fed and watered. Plaintiff distinctly alleged that if the cattle were unruly it resulted from and was caused by the failure to provide proper pens and water. The averments were sufficient to predicate a charge by the court authorizing a recovery from neglect of defendant to furnish feed and water.

3. The testimony as to want of feed and water was also admissible upon the issue made by defendant that the cattle were wild and vicious, and so from these causes they injured themselves. There was proof that when they were fed and watered they quieted down. So the proof of want of feed and water was also admissible upon the issue made by defendant.

4. The charge of the court and the charge given at request of defendant were as favorable to defendant as they should have been, and it was not error to refuse other instructions asked by defendant.

It was correct to refuse defendant's requested charge to the effect that if it were necessary to unload the cattle at Brownwood in order to comply with the law that cattle shall not remain loaded upon cars longer than twenty-eight hours without feed and water, and if they were held for

that purpose and to connect with a regular train, then there could be no recovery for the alleged delay. It is clear that the cattle were not held at Brownwood as long as they were to comply with the law as to feeding and watering; nor could defendant be excused for such delay on the ground that the delay was to secure the further shipment by the regular train.

It is not necessary to express our views as to other assignments. We have considered every issue in the case as presented in appellant's brief and find no error requiring reversal. We believe the judgment of the lower court should be affirmed, and it is so ordered.

*Affirmed.*