EZEKIEL JOHNSTON v. CHICAGO, BURLINGTON & QUINCY
RAILROAD COMPANY.

FILED NOVEMBER 18, 1903. No. 13,134.

1. **Common Carrier:** CHATTEL MORTGAGE: DIVERSION OF SHIPMENT.
   Where the conditions of a valid chattel mortgage have been
   broken, and the mortgagee is entitled to take possession of the
   mortgaged property, wherever found, a common carrier is not
   liable to the mortgagor for a diversion of a shipment of such
   property and a delivery of the same to the mortgagee demanding
   possession thereof while it is still in the carrier's hands.

2. ———: DELAY IN SHIPMENT: EVIDENCE. In order to recover dam-
   ages for an alleged delay in the shipment of live stock, it is nec-
   essary to introduce some competent evidence tending to show the
   length of time ordinarily required to transport the shipment from
   the place where received to the point of delivery, and that a
   longer time was actually consumed than was necessary for that
   purpose.

3. **Action by Mortgagor:** RIGHTS OF PARTIES. Where a mortgagee
   consigned a shipment of cattle, described in his mortgage, to a
   commission firm in order to protect the payment of his mortgage
   debt, and as soon as payment thereof was made directed the
   delivery of the shipment to the firm designated by the mortgagor,
   no action will lie against the carrier for nondelivery to the party
   designated by such mortgagor.

4. **Amendments:** DISCRETION OF COURT. It is not an abuse of discre-
   tion for the district court to refuse to permit the plaintiff to
   file an amended reply where it changes the issues made up in the
   county court, where the case was originally commenced and
   tried, and where the right to recover on the new matter con-
   tained in such amended reply is barred by the statute of limita-
   tions.

ERROR to the district court for Phelps county: ED L.
ADAMS, JUDGE. *Affirmed.*

*James I. Rhea, John M. Stewart* and *Samuel A. Dravo,*
for plaintiff in error.

*Webster S. Morlan* and *J. W. Deweese, contra.*

BARNES, C.

This case is before us a second time. On the former
trial, in the district court, the plaintiff recovered a judg-

ment, which was reversed in this court in the case of *Chicago, B. & Q. R. Co. v. Johnston,* 1 Neb. (Unof.) 314. A second trial in the district court resulted in a verdict and judgment for the defendant, from which the plaintiff prosecuted error. The facts stated in our former opinion, and detailed therein, are presented in the present record, without any essential variance. We therefore, in substance, adopt that statement of the case as follows:

Ezekiel Johnston brought this action against the Chicago, Burlington & Quincy Railroad Company to recover damages for an alleged breach of contract between said parties, whereby the latter undertook and agreed to ship certain cattle for the former, by rail, from Holdrege to Chicago. The breach assigned by the plaintiff in his petition is, that the cattle were diverted from the direct route between said points to South Omaha, where they were detained for some hours and then forwarded to Chicago and delivered to another and different party than the one specified in the contract of shipment. The damages claimed are for the diversion above stated, for delay in the shipment and for the delivery to a person other than the one provided for in the contract. The defendant, by its answer, admits that the cattle were taken to South Omaha and there detained for some time, but alleges that, prior to the shipment of the cattle, the plaintiff had executed and delivered certain mortgages thereon to one J. H. Pratt; that by the terms of the mortgages, in case the plaintiff should remove, or attempt to remove the cattle from his premises in Phelps county, Nebraska, or attempt to dispose of them, the mortgagee should have the right to take immediate possession of the cattle, by himself or agent, wherever found, and when the cattle should be removed or shipped for sale they should be consigned to the mortgagee at South Omaha, and that they should not be shipped or sold without his order or consent; that such consent was never given, and when the duly authorized agent of the mortgagee learned of said shipment, and while said mortgages were still in force and unsatisfied, he stopped the

shipment and took possession of the cattle at South Omaha,
under and by virtue of said mortgages; that, afterwards,
in pursuance of an arrangement between the agent of the
mortgagee and the plaintiff, the cattle were reshipped from
South Omaha to Chicago without unnecessary delay, con-
signed to an agent of the mortgagee and, upon satisfaction
of the mortgages, were at once turned over to the person
or firm designated by the plaintiff. The reply is a gen-
eral denial.

The plaintiff now contends that the defendant was not
justified in the diversion, the delay or the nondelivery at
destination, and in consequence is liable to him for dam-
ages. It appears that in October, 1895, J. H. Pratt shipped
the cattle in question from Cadiz, Wyoming, billed to him-
self at Chicago, with the privilege of stopping and feeding
at some point on the way in order to fatten and prepare
them for market. They were stopped at Holdrege, where
the plaintiff purchased the cattle, and gave his two notes
dated October 29, 1895, secured by mortgages on the
cattle in payment. The notes were made payable at the
Union Stock Yards National Bank of South Omaha, six
months from date, and the mortgages were recorded in
Phelps county. They contained the following provision:

"It is hereby agreed and understood by and between said
parties that said cattle shall not be removed by the party
of the first part or taken from the section and township
(section 27, township 5, range 18, in Phelps county) on
which the same are herein declared to be situated, without
written consent of the party of the second part (Pratt),
and when removed or shipped for sale they shall be con-
signed to James H. Pratt, mortgagee, at South Omaha,
Nebraska, to be sold on commission; the said party of the
first part hereby covenants and agrees that in case the said
first party shall remove, or attempt to remove, or permit
to be removed from said premises, or dispose of, or attempt
to dispose of, said stock or any part thereof, or in case the
party of the first part shall fail to keep any of the argree-
ments herein contained, or if the party of the first part

shall fail in full, or in part, with reference to the payment of the sums of money mentioned, then in all or any of the cases aforesaid the said second party shall have the right and power to take immediate possession (personally or by agent authorized by the possession of this instrument) of all of said stock wherever found, without legal process, in order to satisfy his lien."

On the 16th day of December, 1895, Pratt, the mortgagee, gave one Alex. Laverty full power of attorney authorizing him to collect the notes, release the mortgages, and do everything about the contract as fully as Pratt himself could do. On Saturday, April 11, 1896, Johnston and the First National Bank of Holdrege shipped the cattle, consigned to J. H. Pratt, to Chicago, Illinois. A day or two before, Johnston had spoken to Mr. Engstrom, the agent of the railroad company at Holdrege, about the shipment, and had ordered cars for that purpose at that time. At the time of the shipment, on Saturday, the plaintiff had not paid the mortgages, which lacked some eighteen days of being due, and had not notified either Pratt or Laverty that he was intending to ship the cattle and did not have the consent, written or otherwise, of Pratt or his agent to make the shipment. It is claimed by plaintiff that he told Engstrom that he had Laverty's permission for the shipment to Chicago, and that he had arranged with the bank to pay the mortgages, which arrangement he said was satisfactory to Laverty; and, with full knowledge of such arrangement, the agent received the shipment on Saturday, and the company was therefore bound to transport the shipment to Chicago without delay. This claim is not borne out by the evidence, and the finding of the jury was against him thereon. The evidence given by the plaintiff is as follows: "I told Engstrom I was going to ship the cattle to Chicago, and he says, have you got permission from Laverty to ship them to Chicago. I said he told me I could. He said don't depend on what Laverty told you; you had better have a statement in writing from him before you ship, and I would advise you to get a per-

mit before you ship." Plaintiff testified that he after-
wards wrote to Laverty, but does not state the substance
of his letter, and he never received any word in answer
from Laverty, or any one representing him; that a day or
two before the shipment he again saw Engstrom, who asked
if he had heard from Laverty, and he said he had not; that
Engstrom urged him to make an arrangement to pay the
mortgages off for fear Laverty would cause trouble, and
advised him to get the money from the bank and pay the
mortgages if he was going to Chicago with the cattle. It
appears that Johnston made arrangements with the bank
to make the payment to Pratt at South Omaha by means
of money that he borrowed for that purpose, and the ship-
ment was made in the name of the bank as security for the
payment of the drafts, which the bank mailed to Omaha
on Saturday evening after the shipment was made at noon.
It further appears that, the next day being Sunday, this
draft did not reach Laverty and the Omaha bank until
Monday forenoon. Laverty first saw the draft, and knew
it had been sent or issued, on Monday forenoon of April
13, and the only information he had about it, before, was
Johnston's statement on Sunday in the Exchange building
in South Omaha that the draft had been arranged for and
would be sent by the Holdrege bank. But Johnston him-
self says that he simply made arrangements with the bank
on Friday; did not ask the bank when they were going to
send the draft, or anything about it, but supposed that
they had fixed it up, and that at the time the shipment was
made he did not know whether the mortgages were paid or
not; took no trouble to find out, and had heard nothing
from the bank at all as to whether the mortgages were paid
when the shipment was made, or when it was stopped and
diverted to South Omaha. When Laverty found out late
Saturday afternoon that the shipment was made, by in-
quiry by wire, Engstrom did not know anything about any
arrangement with the bank, and did not know what ar-
rangements had been made.

The record shows now, as it did before, that Laverty told

Johnston that his commission firm would like very much to sell the cattle if everything was satisfactory, but if he desired to go to other commission firms it would be all right. This testimony does not go to the matter of shipping the stock in violation of the provisions of the mortgages before payment, and it can not be claimed that this casual talk about which commission firm might make the sale amounted to a consent to Johnston to ship, when and where he pleased, without having paid the debt, or having obtained the written consent of the mortgagee. Johnston admits in his testimony that his shipment was consigned to Pratt at Chicago, care of Rosenbaum Bros., in order to obtain the through rate; that J. H. Pratt was the consignee, and could have changed the shipment himself. The record therefore shows, as the jury found, that the shipment was made on Saturday in violation of the provisions of the mortgages against the removal of the stock; that the payment had not been made; that no arrangement for payment had been made with Laverty, and that the shipment was entirely without his knowledge or consent; that the shipment was made to Pratt as the original billing required, and that the agent of the railroad company did not know that Johnston had failed to observe his warning to obtain authority for the shipment, and did not know whether payment had been made or not. So far as he knew, Pratt was the actual consignee and entitled to the possession of the cattle, if he desired it, under his mortgages, if they had not in fact been satisfied. It further appears that during Saturday afternoon Laverty, at Omaha, learned of the shipment and made inquiry through the railroad agent there, and was informed when and by whom the shipment was made. At that time he had given no consent for the shipment, and knew nothing of Johnston's letter concerning it, or of any attempt at payment of the mortgage debt, and he, thereupon, presented his mortgages and power of attorney to the agent of the railroad company, and demanded that the shipment be brought to South Omaha for his benefit. Under this state of facts, the

defendant was justified in diverting the property to South Omaha and in delivering it to Laverty as the agent of Pratt. The defendant, as a common carrier, was bound to receive the goods for carriage. It could make no inquiry as to the ownership. It has not voluntarily raised the question; it was raised by demand of the real owner before the defendant had parted with the goods. The law would have protected defendant against the real owner, if it had delivered the goods in pursuance of defendant's employment, without notice of his claim; it will equally protect it against the *pseudo* owner, from whom it could not refuse to receive the cattle, in the present event of the real owner claiming them and their being given to him. The compulsory character of the employment of a carrier furnishes ample ground for so holding. Hutchinson, Carriers (2d ed.), p. 404; *Shellenberg v. Fremont, E. & M. V. R. Co.*, 45 Neb. 487; *Wells v. American Express Co.*, 55 Wis. 23; *Cleveland, C. C. & St. L. R. Co. v. Moline Plow Co.*, 13 Ind. App. 225; *Western Transportation Co. v. Barber*, 56 N. Y. 544; *Bliven & Mead v. Hudson River R. Co.*, 36 N. Y. 403.

"Ordinarily, the person who delivers the goods to a common carrier is to be treated by them as the owner, and, in general, his title may not be disputed by the company, or a *jus tertii* or adverse title be set up, but the goods must be delivered according to his directions without putting him upon proof of his title. That applies, however, only where such adverse claim is not asserted by the superior claimant to the sender, but merely by the carrier's own motion. But, should the goods be the property of a third person who is also entitled to the possession of them, and, while in the custody of the carrier, such owner should demand possession, it would be justified in delivering the goods to him." Hale, Bailment and Carriers, p. 497, and cases there cited.

We therefore hold that the verdict, so far as this question is concerned, is sustained by the evidence, and the instructions of the court were without error.

It is next contended by the plaintiff that he is entitled to recover damages by reason of unnecessary delay in the shipment. It appears from the evidence that after the cattle had been taken possession of by Laverty for and on behalf of the mortgagee, Pratt, and placed in the yards at South Omaha, an arrangement was made between the plaintiff and Laverty by which the cattle were again loaded into defendant's cars and forwarded by special train to Chicago. This contract of shipment appears to have been with Pratt, and to him, in the care of Greer, Mills & Co. Plaintiff offered no evidence to show the ordinary and usual length of time necessary to transport the cattle from South Omaha to Chicago, and there is no proof in the record that the time consumed by the defendant in getting the cattle from the point of shipment to the place of destination was greater than that ordinarily required for such purpose. So there is no evidence in the record on which to base a claim or judgment for damages for delay in transportation.

It is further contended by the plaintiff that he is entitled to damages on account of the delivery of the cattle to Greer, Mills & Co., at Chicago, instead of Rosenbaum Bros., to whom he had desired the delivery to be made. It appears when the contract of reshipment was made in South Omaha, and the cattle were forwarded to Chicago, Laverty had not yet received the draft mailed on Saturday afternoon to him by the bank at Holdrege; that, in order to secure the payment of the mortgage debt due his principal, Pratt, he had the cattle consigned to the care of Greer, Mills & Co.; that, as soon as he received the draft and the mortgages were in fact paid, he notified Greer, Mills & Co. to turn the property over to Rosenbaum Bros., which was done. It follows that the plaintiff was not entitled to recover any damages on that account. In fact, it is thoroughly established by the evidence that whatever delay, change of route, loss of market, or weight, was suffered in the shipment, resulted entirely from the failure of the plaintiff to observe his obligations under the mortgage

contracts, and on account of his attempting to make the
shipment when he had no authority or right to do so, and
against the express provisions of the mortgages. He may
have been, and without doubt was, entirely honest in his
attempt to arrange for their payment through the Hold-
rege bank, but the payment was not made, and no consent
was given for the shipment, so that to the mortgagee and
to the defendant, it had all the appearances of a fraudu-
lent transaction, in which the defendant was bound to
observe the demands of the mortagee in stopping the ship-
ment and forwarding it only to his order. All of the
conditions then existed, authorizing Laverty to take pos-
session according to the terms of the mortgages. *Meyer v.
Michaels*, 69 Neb. 138. The fact that the money was on the
way, at the time the cattle were shipped, without the
knowledge of Laverty or the defendant, does not affect
the situation.

Plaintiff also contends that the court erred in refusing
him the right to file his amended reply. It was largely in
the discretion of the district judge whether he would per-
mit the filing of the amended reply or not. And the exer-
cise of that discretion can not be overruled without es-
sential and fundamentally good reason. The issues in the
case had been carefully made up in the county court, and
also in the district court; the case had been twice tried on
these issues, and the offer to file the amended reply was
an attempt to introduce new issues and a new controversy
into the action. The court properly exercised his discre-
tion in refusing to permit it. Again, the right to recover
on the basis of the allegations contained in the amended
reply was barred by the statute of limitations; the ship-
ment was made in April, 1896, the amended reply, present-
ing new rights of recovery, was offered for filing in May,
1902; these new grounds for recovery could become effect-
ive only from the date of the filing of the reply, which
was more than four years from the carriage of the shipment
and after any cause of action could accrue thereon. *Buer-
stetta v. Tecumseh Nat. Bank*, 57 Neb. 504; *Box v. Chicago,
R. I. & P. R. Co.*, 107 Ia. 660.

We are of the opinion that the verdict of the jury was sustained by sufficient evidence, that the judgment was right, and finding no reversible error in the record, we recommend that the judgment of the district court be affirmed.

GLANVILLE and ALBERT, CC., concur.

By the Court: For the reasons stated in the foregoing opinion, the judgment of the district court is

AFFIRMED.