TILLER & SMITH, Appellee, v. CHICAGO, BURLINGTON & QUINCY RAILROAD COMPANY, Appellant.

**Transportation of live stock:** RULES GOVERNING CARRIERS. In the absence of a contract as to the time of delivery of live stock the carrier is held to a delivery within a reasonable time after receipt of the same.

The responsibility of a carrier for prompt delivery of live stock, in the absence of a special contract, is that of an ordinary bailee for hire, and his liability for unreasonable delay or for delivery too late for market is on the ground of negligence and not on the ground of an insurer as to time.

A reasonable time for the delivery of live stock is dependent upon the length of the journey, the mode of conveyance, condition of the road, season of the year, nature of the stock and other circumstances, and is usually a question for the jury.

Unless the carrier contracts to deliver stock by a special train it may make such reasonable train schedules as are proper to the ordinary and economical conduct of its business, having regard to the nature of the stock to be transported.

**Transportation of live stock:** ACTIONABLE DELAY: EVIDENCE. In the instant case the evidence is reviewed and it is held that the carrier was not guilty of actionable delay in the shipment of plaintiffs cattle.

*Appeal from Fremont District Court.*—HON. A. B. THORNELL, Judge.

SATURDAY, APRIL 10, 1909.

ACTION to recover damages due to defendant's delay in carrying one hundred and seventy-one head of fat steers from Watson, Mo., to Chicago, Ill. Defendant denied any actionable delay, and on the issue joined the

case was tried to a jury, resulting in a judgment for plaintiff, and defendant appeals.—*Reversed.*

*H. J. Nelson* and *T. S. Stevens,* for appellant.

No appearance for appellee.

DEEMER, J.—Defendant is a common carrier having a line of railway from Watson, Mo., to Pacific Junction, Iowa, and from Pacific Junction to Chicago, Ill. One of its regular feeding stations for live stock is at Galesburg, Ill. On the 10th of December, 1906, plaintiff delivered the animals in question to the defendant at Watson, Mo., for shipment to Chicago, Ill. Defendant had two northbound trains scheduled to arrive at Watson on December 10th, known as Nos. 91 and 81. No. 91 was to arrive per schedule at 1:30, and No. 81 at 3:15, p. m. When plaintiff arrived at Watson with his cattle, he was informed that No. 91 was late, and that the animals would be taken on No. 81, which would leave that day at 4 or 4:30 p. m. The loading of the cattle began at about 3:30, was concluded, and the cars in which they were loaded were attached to No. 81, which left at 5:15 p. m., arriving at Pacific Junction at 9:15 p. m. The delay in these two trains is accounted for in the manner hereinafter stated. What was known as No. 34 usually left Pacific Junction for Chicago at 12:15 a. m., but on the 11th of December it was late and did not depart therefrom with plaintiff's stock until 2:30 a. m. The delay of this train is not explained. Further delays of No. 34 occurred between Pacific Junction and Creston, which are explained in a manner hereinafter to be stated. The cattle arrived at Ottumwa, Iowa, at 3:25 p. m. on December 11th, left at 3:32, and arrived at Galesburg, Ill., at 9 p. m., one hour and thirty minutes behind the schedule time for No. 34. The cattle had then been so long on the road that it was defendant's duty under the federal

statutes to unload and feed them, and this it did at Galesburg, where the cattle were held until the next afternoon, when they were taken to Chicago, reaching there in time for the Thursday morning market. The cattle were taken from Galesburg on the first train leaving there for Chicago after they were unloaded and fed, and the regular schedule time of trains from Galesburg to Chicago is thirteen or fourteen hours.

Plaintiff claims that it delivered the cattle to defendant in time for its regular freight train which should have left Watson, Mo., at 1:30 p. m. and that by reason of the delays of that train, and the delays of trains numbered 81 and 34, its cattle did not reach Chicago for the Wednesday market, as they would have done, but for the delays, and that he was damaged by reason of the shrinkage of the animals $93.72, in the sum of $35 for extra feed, and in depreciation of the market $218.48. Defendant, while admitting some of the delays charged, claims that the cattle were shipped on the first regular trains, and that they reached Chicago as soon as if the trains had all been on schedule time. The jury returned a verdict for plaintiff in the sum of $218.48, being the exact amount claimed by them on account of the decline in the market. Complaint is made of some of the instructions given, of the refusal to give some of those asked by defendant, and of the verdict.

As to the verdict, it is insisted that it is entirely without support in the testimony, and that the court was in error in not giving some of the instructions asked by it, which practically directed a verdict in its favor. The theory on which the case was presented is best shown by the following quotations from the instructions:

(5) It must appear from the evidence that after the cattle in question were loaded at Watson, Mo., and delivered to the defendant company, that the defendant company was negligent, in that it failed to deliver said cattle

at their destination within a reasonable time; and, unless this is shown, the plaintiff can not recover. The plaintiff claims that the defendant company was negligent in failing to transport the cattle in question with reasonable dispatch, between the time the cattle were received by defendant at Watson, Mo., and the time that said cattle were reloaded at Galesburg, Ill., after they had been unloaded and fed there. They do not claim that the defendant company were negligent in the transportation of said cattle after they were reloaded on the train at Galesburg, Ill., and started for Chicago; but they claim that the defendant company were negligent, in that there was unreasonable delay, and an unreasonable length of time consumed by the defendant company, in transporting said cattle between the time that said cattle were received by the defendant company at Watson, Mo., and the time said cattle were reloaded upon the defendant's train at Galesburg, Ill., after said cattle had been fed at Galesburg. Now, when the cattle in question were loaded upon the defendant's cars by the plaintiff, and received by the defendant company, at Watson, Mo., the defendant company was bound to furnish reasonable facilities and to exercise reasonable care to the end that they should deliver said cattle at their destination within a reasonable time after they were received by them, and, if they failed to do this, such failure upon their part would constitute negligence.

(6) In deciding whether the defendant company were guilty of negligence in transporting said cattle, and handling same, up to the time that they were reloaded at Galesburg, Ill., after being fed there, you should consider, so far as shown by the evidence, the distance that said cattle had to be transported, when they were turned over to the defendant company at Watson, Mo., and what delays there were unavoidable, or were due to the negligence of the employees of the defendant company, the length of time that the cattle were held in Galesburg, Ill., and the length of time that they should have been held there; and, from these and every other fact and circumstance shown by the evidence, you must say whether the defendant company was guilty of negligence in transporting said cattle from Watson, Mo., to the time that they were reloaded at Galesburg, Ill., or not.

(7) Under the law governing the transportation of said cattle, the defendant company could not keep said cattle confined in the cars to exceed twenty-eight consecutive hours, without unloading same into properly equipped pens, for rest, water and feeding, for a period of at least five consecutive hours, unless prevented by storm, or by other accidental or unavoidable causes.  Under this law, when said cattle reached Galesburg, if they had been then confined in the cars for twenty-eight consecutive hours, the defendant company were bound to unload them for food, rest and water for at least five hours; but the defendant company were not bound to hold said cattle in the pens at Galesburg, after unloading them, to exceed five hours, but this five hours would be exclusive of the time consumed in unloading and reloading said cattle. Whether the defendant company were negligent, or not, in retaining said cattle in the feed pens at Galesburg in excess of five hours, would depend upon whether, if they had reloaded the cattle immediately upon the expiration of the five hours, or as soon thereafter as was practicable, the cattle could have been placed or would have reached the Chicago market on December 12, 1906, instead of December 13, 1906; that is, had the cattle been reloaded and shipped by the defendant company immediately upon the expiration of the five hours, or as soon thereafter as was practicable for the shipment thereof on some one of their regular trains, would they have reached the stockyards in Chicago in time to be sold upon the cattle market of December 12th?  If, by reloading and shipping same immediately at the expiration of five hours, or as soon thereafter as was practicable for shipment on some of their regular trains, the cattle could not have reached the Chicago market in time for the cattle market of the 12th of December, then it could not be said that the delay in the stockyards at Galesburg was the cause of any injury to the plaintiff.

(8) In deciding whether the defendant company was guilty of negligence in transporting said cattle from Watson, Mo., to Galesburg, Ill., you should consider what trains were run regularly upon the defendant's road, over the line on which said cattle were shipped, and whether said trains were on time or behind time, and, so far as

shown by the evidence, the cause of the defendant's train being behind time, if such delay is shown, whether it was unavoidable, or whether it resulted from the negligence of the agents of the defendant company. Where the usual or ordinary running time between two given points is shown for the transportation of freight, like the cattle in question, and it further appears that the time consumed in transporting the freight in question exceeds the usual or ordinary time, then it becomes incumbent upon the carriers of such freight to show that such delay was not due to the negligence of its employees or officers in charge of its train. In this case, if the usual or ordinary time consumed in transporting cattle between Watson, Mo., and Galesburg, Ill., is shown by the evidence, and it further appears from the evidence that the time consumed by the defendant company to transporting said cattle from Watson to Galesburg, after it received the cattle at Watson, was in excess of the usual or ordinary time for the transportation of such freight, then it would be incumbent upon the defendant company to show that such delay in shipment was not due to the negligence of its employees in running its train. The defendant company, in transporting the plaintiff's cattle, was only bound to exercise reasonable care in furnishing facilities for transporting same, and, if its usual or ordinary trains were usually and ordinarily reasonably sufficient to transport the cattle and other freight consigned to it, reasonable care would not require it to put on additional or extra trains to transport plaintiff's cattle. It was bound only to furnish such facilities for transportation as were usually and ordinarily sufficient to transport the freight consigned to it.

(10) If it appears from the evidence that the defendant company was negligent in the particulars complained of by the plaintiff, and that the plaintiffs were not guilty of negligence upon their part that helped to bring about the delays in question, still, for the plaintiff to recover, it must, of course, appear that the negligence of the defendant company was the direct and proximate cause of the plaintiff's injury; that is, that but for such negligence no injury or damage would have happened to the plaintiff. The injury complained of by the plaintiff arises, as claimed by plaintiff, from the fact that their

cattle did not reach the Chicago market on the 12th day of December, 1906, but were delayed, so that they did not reach said market until the 13th, and that by reason thereof plaintiffs were damaged by a depreciation in the market of ten cents a hundred, and by an additional shrinkage of the cattle. But, if it appears from the evidence that the defendant was negligent in transporting the cattle, to recover, it must appear that but for such negligence the cattle would have reached Chicago in time for the cattle market of December 12th. If the defendant was negligent, still, if it further appears that, even if such negligence had not occurred, the cattle could not have reached the Chicago market before the 13th of December, then it could not be said that the defendant's negligence was the direct and proximate cause of the plaintiff's injury, and in that event the plaintiff could not recover.

As opposed to these instructions, the defendant asked the following, among others:

(3) The court instructs the jury that if the time for which the defendant was required to keep the cattle in question off of the cars at Galesburg, Ill., including the time necessarily consumed in unloading, feeding and reloading said cattle, expired so late that defendant could not reach Chicago by carrying said cattle upon its first available regular train thereafter from Galesburg to Chicago, Ill., in time for the market upon the 12th of December, then it was not negligence for defendant to hold said cattle in Galesburg longer than was made necessary by reason of the federal statute requiring the unloading and feeding of said cattle, providing same arrived in Chicago in due time for the opening of the market upon the morning of the 13th of December.

(4) The court instructs the jury that any delay in the shipment of the cattle in question at any one or more points along the route of shipment would not, in itself, be sufficient to entitle the plaintiff to recover, even though caused by the negligence of the defendant, if said cattle did in fact arrive in Chicago in time for the same market upon which said cattle could have been offered or sold as

they would have arrived for had no such negligence nor delay occurred; and if only such delay or negligence is shown the plaintiff can not recover.

(5) The court instructs the jury that under the evidence they must find there was no delay such as to constitute negligence in the shipment or handling of the cattle in question between Watson, Mo., and Galesburg, Ill.

Instructions Nos. 5 and 7, as given by the court, are challenged, and error is predicated upon the refusal of the court to give the third, fourth and fifth, asked by defendant.

For the solution of the matter presented it is necessary to state the law with reference to carriers of live stock. Where there is no contract for delivery within a given time, it is the duty of a carrier to transport the goods with all convenient dispatch, with such suitable and sufficient

1. TRANSPORTATION OF LIVE STOCK: rules governing carriers.

means as it is required to provide for its business; in other words, to deliver within a reasonable time after the receipt of the property. This duty is one ingrafted upon the contract of carriage; but the responsibility of the carrier in this respect is simply that of an ordinary bailee for hire. If by unreasonable delay the property is damaged, or it arrives too late for the market, recovery may be had because of the negligence of the carrier. The extraordinary liability of a carrier, whereby it practically becomes an insurer for the safety of the goods, does not apply to the time occupied in its transportation. Its liability is based upon negligence, and not on the extraordinary liability imposed by law upon common carriers. What is a reasonable time within which a carrier must transport goods is to be determined from the length of the journey, the mode of conveyance, the state of the roads, the season of the year, the nature of the goods, and other circumstances shown; the question being ordinarily for a jury under proper instructions. The carrier may ex-

cuse its delay, if any there be; and if it be without fault or negligence on its part there can be no recovery. Unless the carrier undertakes to carry by special train, it may make such reasonable train schedules as may be proper to the ordinary and economical conduct of its business, although the nature and character of the goods must at all times be considered; and, in the absence of a special contract fixing the time of delivery, a delay without fault on the part of the carrier will not render it liable. *Siemonsma v. Railroad,* 137 Iowa, 607; *Lewis v. Railroad,* 70 N. J. Law, 132 (56 Atl. 128; *Johnston v. Railroad,* 70 Neb. 364 (97 N. W. 479); *Gulf R. R. Co. v. Porter,* 25 Tex. Civ. App., 491 (61 S. W. 343).

Returning, now, to the record, we find that, while plaintiff at one time suggested to defendant's agent that it wished a special train for the stock, this idea was abandoned, and the agent was informed that the shipment would be made on a regular train, and request was made of this agent that he get permission to hold the regular train No. 91 until 4 o'clock p. m. on December 10th, as they would drive the cattle to town, and did not know that they could get them there before that time. Both trains 81 and 91 were delayed by reason of a derailment of cars in the yards and upon the track of the defendant company at St. Joseph. The loading of the cattle began at 3:30 p. m. on December 10th, and the train left Watson at 5:15 p. m., arriving at Pacific Junction, as we have seen, at 9:15 p. m. Plaintiff requested that the shipment be made via Pacific Junction. The east-bound train from Pacific Junction was two hours and fifteen minutes late, and did not leave the latter place until 2:30 a. m. December 11th. The delay of the east-bound train is not explained. Had either No. 81 or 91 been on time, the stock could not have left Pacific Junction upon any regular ·scheduled train until the time for the departure of

*2. TRANSPORTA-TION OF LIVE STOCK: actionable delay: evidence.*

No. 34, which was scheduled to leave at 12:15 a. m.
Some further delays occurred between Pacific Junction
and Creston, due to necessary waits for passenger trains,
hot boxes, setting out cars, etc., and other things properly
incident to the operation of its road; but the train ar-
rived at Galesburg at 9 p. m., not more than one hour and
thirty minutes behind its scheduled time. It was defend-
ant's duty under the federal statutes to unload and feed
at Galesburg, and this it did; and the cattle were sent out
from Galesburg on the first regular train which left after
the cattle were fed, and there is no claim of any delay
after the cattle left Galesburg. The scheduled rate of
speed for train No. 81 was 11.6 miles per hour; for No.
91, 9.1 miles per hour; and for No. 34, 18 miles per hour
—the latter being the fastest freight train between Pacific
Junction and Chicago. The distance from St. Joseph to
Pacific Junction is fifty-two miles, from Pacific Junction
to Galesburg 315 miles, and from Galesburg to Chicago
163 miles; the scheduled running time between these two
latter points being fourteen hours.

Plaintiff claims that, had there been no delay, the
stock would have reached Chicago in time for the Wed-
nesday's market; while defendant insists that, had all
the trains been on time, the animals would not have
reached Chicago for the market on that day. The verdict
was evidently based upon the thought that defendant's
delay caused plaintiff to miss the Wednesday market. As
the court took from the jury the issue of defendant's neg-
ligence in the shipment of the stock from Galesburg to
Chicago, the only question for our consideration is: Do
the facts show such delay in shipment between Watson,
Mo., and Galesburg, Ill., as to justify the submission of
the case to the jury upon the proposition that, but for
such delay, the cattle would have reached Chicago in time
for Wednesday's market? The ultimate facts are that the
cattle left Watson at 5:15 p. m., arrived at Pacific Junc-

tion at 9:15 p. m., left Pacific Junction on the first regular train at 2:30 a. m. the next day, and arrived at Galesburg at 9 p. m. that day, about one hour and thirty minutes late, where they were unloaded and fed, remaining there until the next afternoon, when they were taken to Chicago on the first regular train, reaching Chicago in time for the Thursday's market.

Plaintiff testified that the usual running time between Watson and Chicago was from twenty-six to thirty-two hours, that defendant's agent said there was a train leaving Pacific Junction at 8 p. m., and that the ordinary time from Watson to Pacific Junction, from thirty to thirty-eight miles, was two hours. But this latter statement is evidently a mistake. It further appeared that cattle had to be in Chicago by ten o'clock a. m. to be on the market for that day. Other witnesses testified that the run from Watson to Chicago should be made in from twenty-eight to thirty-six hours, without adding time for feeding. Still another said that cattle at Watson, Mo., should arrive at Chicago the second morning after departure. The uncontradicted evidence shows that there was no train leaving Pacific Junction at 8 p. m., and none earlier than No. 34, had there been no delay in the train from Watson to Pacific Junction. It was also shown without dispute that this No. 34 was the fastest freight train on defendant's road from Pacific Junction to Chicago, and that it was but one hour and thirty minutes late when it reached Galesburg. The testimony also shows, without apparent contradiction, that about eight hours are required to unload, feed and reload cattle at Galesburg; and the statute required that they shall be allowed five consecutive hours for rest, water and feed.

Assuming, then, that the train which carried plaintiff's cattle was but one and one-half hours late, and that the cattle, after being unloaded, fed and reloaded, left for Chicago on the first train operated by defendant, the ques-

tion is: Was more than a reasonable time taken at Galesburg for unloading, watering and feeding, and reloading; and was there, or should there have been, a train which would have taken the cattle from Galesburg in time to have reached Chicago for the Wednesday market. There can be no doubt that the train arrived at Galesburg at 9 p. m., although one of plaintiff's witnesses said that he thought they arrived at Galesburg somewhere from four to five o'clock. This can not be true, for No. 34 was not due there until 7:30, and this particular train is shown to have been at Ottumwa, Iowa, at 3:32 p. m., and that it took five hours and twenty-eight minutes to cover the distance between Ottumwa and Galesburg, which was something like two hours faster than schedule time. There is no showing that any train left Galesburg for Chicago upon which the cattle could have been taken prior to the one upon which they were shipped.

Assuming, however, that the cattle arrived at Galesburg at 9 p. m., and that eight hours were required for unloading, etc., it would be five o'clock a. m. before the cattle could be shipped from Galesburg. Again assuming that a train left immediately, it would not arrive in Chicago until 7 p. m., assuming, as we must, that fourteen hours is the running time between Galesburg and Chicago. Moreover, had the stock reached Galesburg at 5 p. m. they could not have arrived in Chicago after being fed and watered until 3 o'clock p. m. of Wednesday, too late for the Wednesday's market. However, the arriving time of the train at Galesburg was 7:30 p. m., and we are satisfied that the stock did not reach that place until 9 p. m. The verdict is without substantial support in the testimony, and it should have been set aside, under the rule announced in the *Siemonsma* case, *supra*.

II. For reasons already suggested, the trial court was in error in giving the seventh instruction, and in refusing to give requests Nos. 3, 4 and 5, asked by defend-

ant. Had the jury followed instruction No. 10, given by the trial court, there would have been a verdict for defendant.

For the errors pointed out, the judgment must be, and it is, *reversed.*