M. T. RIDDLE, Appellee, v. CHICAGO, BURLINGTON & QUINCY RAILROAD COMPANY, Appellant.

**CARRIERS: Carriage of Live Stock—Strike as Defense.** The plea that
1   a carrier of live stock was prevented from making delivery because of a strike among stockyards employees must fall when the jury might well find that, if the carrier had exercised reasonable diligence, delivery would have been made notwithstanding the strike. (See Book of Anno., Vol. 1, Sec. 8114.)

**CARRIERS: Carriage of Live Stock—Assumed Burden of Proof.** A
2.   carrier which pleads that, as to a shipment of live stock, it was under the necessity to keep, hold, and feed the stock under the shipper's direction, and that it made every effort to discharge that duty, may not, on appeal, contend that the shipper should be held to the burden of showing that the injury did not result from his negligence.

**EVIDENCE: Best Evidence—Value of Live Stock.** Competent oral
3   testimony of the value of live stock is admissible even though a recognized market journal is in evidence, showing such values.

**TRIAL: Instructions—Correct but Inexplicit.** A correct instruction as
4   to the responsibility of a carrier for the acts of its different agencies employed in transporting and delivering a shipment is sufficient, in the absence of a request for particular limitations thereon.

Headnote 1:  10 C. J. p. 293.  Headnote 2:  10 C. J. p. 301.  Headnote 3:  10 C. J. p. 304; 22 C. J. p. 993 (Anno.)  Headnote 4:  38 Cyc. pp. 1693, 1694, 1695.

Headnote 1:   28 A. L. R. 503; 4 R. C. L. 744.   Headnote 2:   4 R. C. L. 994.   Headnote 3:   4 R. C. L. 999.   Headnote 4:   14 R. C. L. 797.

*Appeal from Clarke District Court.*—HOMER A. FULLER, Judge.

### NOVEMBER 16, 1926.

### REHEARING DENIED JULY 1, 1927.

An action for damages for delay and refusal to carry cattle to destination, claimed by defendant to have been occasioned by strike of the employees of the Union Stock Yards Company in Chicago. Judgment for plaintiff. Defendant appeals.—*Affirmed.*

*L. E. Crist* and *McGinnis & McGinnis,* for appellant.

*O. M. Slaymaker* and *R. E. Killmar,* for appellee.

MORLING, J.—I. Defendant contends that the evidence does not show negligence. Plaintiff shipped from Garden Grove, Iowa, over defendant's lines, on Saturday, March 27, 1920, two

1. CARRIERS: carriage of live stock: strike as defense.

carloads of fat cattle. They were loaded and moved about 5 P. M. By the shipping contract, defendant agreed to transport them "to U. S. Yards, Illinois, consigned to Roach Livestock Company," caretaker to accompany them, and the animals to be loaded, unloaded, watered, and fed by the shipper, or his agents in charge. Plaintiff says that he signed a 36-hour request, with the object of getting them into Chicago without stopping at Galesburg to feed. At about 11 P. M., the Union Stock Yards Company notified defendant that, on account of strike of livestock handlers, no stock would be accepted or unloaded at the yards after noon of March 28th, until further notice. This notice was received by defendant's agents at Galesburg at 11 P. M. Plaintiff's stock was traveling at an average of 11 miles per hour, and did not reach Ottumwa until 2:20 A. M., March 28th, leaving there at 4:15 A. M., and arriving at Galesburg at about 10 A. M. Plaintiff had no knowledge of the embargo until defendant's employees proceeded to unload the cattle into the company's pens at Galesburg, telling him that they could not take them on, be-

cause of a strike in Chicago. Plaintiff testified that, while the stock was kept at Galesburg, he was in suspense; that defendant would tell him nothing definite; that he asked defendant to take the cattle as far as its lines would run, and said he would take them the rest of the way; and that he would have done so; that, on Wednesday, the defendant turned the cattle over to him, saying that he must take his own risk, and look after them himself; that they would not feed them any longer. Plaintiff then rebilled them to East St. Louis, where they were sold at a depreciated price. Defendant fed the cattle at Galesburg, but not with the feed to which they were accustomed. Plaintiff testified that he was objecting to the quantity and quality of the feed furnished. The evidence is that fat cattle would, and plaintiff's cattle did, depreciate in weight and quality in consequence of such strange and disturbed surroundings and change of feed.

From defendant's evidence it appears that the yards are not on the carriers' lines, but that ordinarily the carriers (including defendant) take cars of stock with their own power and crews to the unloading platforms at the stockyards, the crews remaining until the cars are unloaded. Normally, the unloading is done by the stockyards employees. The evidence is that anyone who knows anything about unloading cattle can unload them at the platforms and drive them into the chutes and pens. A car can be unloaded in about two minutes, and two cars can be unloaded on the same platform. About 610 carloads can be unloaded without emptying the unloading chutes. The commission companies have unloaded stock. There is evidence that one commission man, with five helpers, has handled in three hours 105 carloads. Practically all of the driving through the yards from the chutes and pens is done by the employees of the commission men. There is evidence given by defendant's witnesses that cattle are frequently turned over to the commission companies at a distance of 40 to 50 feet from the car. The commission men had keys to the unloading chutes which would open any of them.

A strike vote had been taken the preceding Friday (March 26th), and declared illegal by the union president. There is evidence that the stockyards officials were advised that the vote had been postponed until the following Friday, and they relied thereon. A large number of men went out Saturday morning,

March 27th.  The officers of the Stock Yards Company were advised at 8:30 in the morning of March 27th that 150 in the feeding department had not come to work, and that a part of the cleaning gang had gone out, making about 200 altogether who had gone out.  About 1,000 were employed in the yards.  The employees consisted of radicals and conservatives, the radicals insisting on a strike.  The employees had a meeting at about 11 o'clock (it probably was earlier) Saturday night, March 27th, declared a strike, and walked out.  While there is evidence of a purpose on the part of the strikers to prevent by force other men from taking their jobs, defendant's witnesses also testified that violence was against the rules; that there was no danger of violence from the union men; and that violence was in fact not resorted to.  From Saturday evening to Monday evening, 183 carloads of stock were unloaded without interference.  The evidence is that all the stock that came in until Monday was unloaded.  Stockyards employees (witnesses for defendant) testified that they did not undertake to prevent the owners or commission men from unloading their cattle, or interfere with them; that the Stock Yards Company knew that fact; that they issued an order to the commission men that each man with a membership who wanted to handle his own stock, feed, water, weigh, count, and yard them, could do so; that the union would not have interfered if the commission men and the stock men had unloaded, though they would not tolerate two or three together helping one another; but that the large number of cars billed could not have been so handled.  The testimony of these witnesses was that, if plaintiff had come there with his stock, they would not have interfered with his unloading or selling them, and that they might have been brought in by truck.  There was also testimony that there was an understanding between the stockyards employees' organization and the commission men employees' organization that neither one would handle the other men's work.  One of the employees (a witness for defendant) testified that he did not think the strike would hurt the farmer, as he had the privilege of handling his own stock, and the Stock Yards Company had been so notified.  The object of the strike was to get "a raise" of $1.00 or $2.00 a day.  The strike was settled the following Friday, by the grant of an increase.  There is no evidence that the defendant or the Stock Yards Company

made any effort toward getting the plaintiff's stock to the yards
or to the consignees, or to make delivery; and, so far as appears,
no notice was given to the consignees, or opportunity to them or
to plaintiff to take the stock at the yards, or to unload or take
care of it; and all that was done apparently was a consultation
between the manager and assistant manager of the Stock Yards
Company Saturday night, as a result of which they put out the
embargo. The defendant apparently accepted the notice of the
embargo without any investigation or effort to make the de-
livery.

It was put in evidence by defendant:

"Under the Transportation Act of 1920 it is the duty of the
carrier at primary markets to load and unload live stock at their
own expense. The Union Stockyards being the terminal of all
of the line haul carriers, it performs for the line haul carriers the
service of loading and unloading stock. * * * Practically all of
the live stock * * * is delivered to its platforms by the trains of
the line haul carriers * * * This activity of the Stockyards
Company in loading and unloading live stock is carried on by
the Stockyards Company as an agent of the various lines * * *
The Union Stockyards & Transit Company, as agent of the car-
riers, and as being vitally interested in the welfare of all ship-
pers to the market, felt compelled to advise all interested * * *
of the conditions existing."

On defendant's evidence, the Stock Yards Company was
defendant's agent for unloading and making delivery at desti-
nation. Defendant's case is that its agent at point of delivery
had notified defendant that it would not accept or unload the
stock on account of strike, though the consignee was not con-
sulted about taking it from the cars or from the unloading plat-
forms. Defendant's agent had notice Saturday morning of dis-
turbed conditions, and that one fifth of its men had walked out.
It knew that stock men made large shipments on Saturday for
the Monday market, and that the shipments consisted largely of
cattle in a highly fatted and finished condition, which would
rapidly deteriorate by delay and confinement in railroad stock
pens. Defendant knew, therefore, that the threatened damage
to shippers in general, and to plaintiff in particular, might be
very serious. In the face of the fact of an existing partial walk-
out and general discontent known to defendant's agent, the de-

fendant accepted plaintiff's stock for shipment to the point of
trouble, without informing him of the partial strike and threat-
ening conditions.  Defendant's dispatcher at Galesburg at least
knew of the embargo at 11 o'clock that evening, while plaintiff's
stock was not far from point of shipment, traveling at 11 miles
per hour.  The defendant, with this knowledge, carried the stock
to Ottumwa without warning plaintiff, arriving there at 2:20
and leaving at 4:15, arriving at Galesburg at about 10 o'clock
the next morning.  Though defendant knew that plaintiff's pur-
pose was to have the stock carried through to Chicago without
unloading, it was unloaded at Galesburg.  While the contract
required the plaintiff to care for and feed his cattle, the defend-
ant, by its conduct and method of doing business, recognized
the impracticability of the plaintiff's being able, in a strange
city, without previous warning, to provide proper accommoda-
tions and feed, unexpectedly required from defendant's not
carrying the cattle through, according to the purpose of the 36-
hour waiver.  The defendant itself undertook to furnish the feed
for the cattle.  The emergency entitled the defendant, and was
recognized by it as requiring it, to do this.  In the discharge of
defendant's duty to the plaintiff, "the nature and character of
the goods must at all times be considered."  *Tiller & Smith v.*
*Chicago, B. & Q. R. Co.,* 142 Iowa 309, 317.  The defendant, so
far as shown, did not communicate with the consignee, made no
effort to perform its contract, and did not listen to plaintiff's
protests about the feeding which would be required to mitigate
the damage, or to his request to take the cattle as far as it could.
Defendant's own witnesses testify that the cattle could have
been taken to the yards; and, while there might have been con-
gestion there, there is no conclusive evidence that there was, or
that the cattle could not and would not have been taken care of
at the yards by the plaintiff and the consignee, or that defendant
tried to ascertain the facts.  The contention that to have carried
plaintiff's stock to Chicago would be a violation of the Elkins
Act (February 19, 1903, Chapter 708, Section 1, amended June
29, 1906, Chapter 3591, Section 2 [8 U. S. Compiled Statutes
1916, Section 8597]), declaring that "it shall be unlawful for
any person, persons, or corporation to offer, grant, or give, or to
solicit, accept, or receive any rebate, concession, or discrimina-
tion," etc., is not sustained by the record.  The defendant had

made its contract. The plaintiff was demanding, as he had the right to do, performance. While defendant was under duty to perform all its contracts, the extent of them, the desires of the other shippers, and the claimed impossibility of making deliveries for all who would demand it, are not shown,—at least not conclusively. We need not pass upon the question whether, if the strike had been conclusively shown to be such as prevented the defendant from performing its contract, its delay and refusal to deliver would have been excused thereby. 2 Hutchinson on Carriers (3d Ed.), Section 656 *et seq.* See, also, 10 Corpus Juris 293. The defendant was under duty at least to make reasonable effort and to exercise due diligence to overcome obstacles and to forward the stock and make delivery. *Idem.* The burden of proof was on defendant. Whether the evidence showed the use of such effort, diligence, and care was for the jury, and not for the court, to determine. See *Stillman v. Chicago, R. I. & P. R. Co.*, 196 Iowa 612.

II. Defendant argues that the burden was on the plaintiff to show that the injury did not result from his own negligence, and that it was his duty to see that the cattle had proper care,

2. CARRIERS: carriage of live stock: assumed burden of proof.

and were properly fed; and that, if he did not want the feed that was furnished by defendant, it was his duty to get it himself. In addition to what has been said upon this subject, we may say that defendant pleads that, on account of the embargo:

"It became necessary for this defendant to keep and hold said stock in the feed yard of this defendant company at Galesburg, Illinois, which was done, * * * That said stock was in the care of plaintiff herein, and that the same was unloaded, cared for, and fed under the direction of the plaintiff, he determining the amount of feed said stock should have and the care they should receive, all of which was done at his instance and direction. * * * That the defendant did everything that it was possible to do to care for, feed, and protect said stock, which was done; and whatever loss, if any, the plaintiff sustained on account of the necessity of holding the same in the stockyards at Galesburg, Illinois, and shipping it to * * * East St. Louis, Illinois, was without any fault, neglect, or carelessness on the part of the defendant."

The issue raised by the defendant, therefore, was that it

was under the necessity of keeping, holding, and feeding the stock under plaintiff's direction, and that it did everything that it could in the discharge of that duty. The plaintiff's evidence was directed to that issue. The court told the jury that no allowance should be made for any extra shrinkage resulting from the feed furnished.

III.   Error is assigned on the admission of the testimony of witnesses to the market value of the cattle in Chicago, on the ground that it is not the best evidence; as the Drovers Journal,

3. EVIDENCE: best evidence: value of live stock.

introduced, showed the market value, and the witnesses were not at the market. These witnesses were stock men, who had been for many years keeping in touch with the market, who took the Drovers Journal, who were themselves at that time taking fat cattle to market, who testified to the condition and class of plaintiff's cattle, who by their evidence applied the prices thereto. Their testimony was properly received.

IV.   The court submitted to the jury the question whether there was any negligence on the part of the defendant or any connecting carrier or agency employed by it as a part of the

4. TRIAL: instructions: correct but inexplicit.

system employed to transport plaintiff's live stock. Defendant complains that the court did not instruct the jury that the employees of the Union Stock Yards Company were no longer in their service after they had quit, and neglected to define the word "strike." If a more specific instruction on these matters was desired, it should have been requested. *Des Moines Sav. Bank v. Kennedy,* 142 Iowa 272, 277. The word "strike" is not, under the issues here, a technical term, requiring definition. The existence of a strike was not of itself a defense. As has been noted, the ultimate question raised and tried was whether, under the conditions existing at the stockyards, the defendant did all that was required of it in the way of reasonable effort, diligence, and care. Defendant says that the courts do not agree about the definition of the word "strike." To have attempted to define it would, therefore, have amounted to going out of the way to raise an incidental question, and it would have given undue importance to the alleged strike, and have distracted the attention of the jury from the real issue. This is true also as to the other complaint referred to. Defendant complains that the court did

not call the "jury's attention to what would constitute reasonable time or ordinary care and reasonable diligence under the facts and conditions" of the case. The court did define the terms "reasonable diligence," "ordinary care," "reasonable care." The court told the jury that it was the carrier's duty to transport the cattle with all reasonable dispatch, after receiving it. The court instructed fully on the subject of defendant's duties and what would satisfy them. No request for a more specific instruction on this subject was asked. No error in the instructions is made to appear.

Eighteen errors are assigned. We have noticed all that have been argued and that demand particular consideration.

We think the case was fairly tried and submitted, and the judgment is—*Affirmed*.

DE GRAFF, C. J., and EVANS and ALBERT, JJ., concur.