ROBERT M. HUFF, Appellee, v. UNITED VAN LINES, INC., Appellant.

No. 46999.

JUNE 17, 1947.

Shull & Marshall, of Sioux City, for appellant.

Baron & Bolton, of Sioux City, for appellee.

BLISS, J.—Plaintiff's petition set out the written order for services or contract under which defendant agreed to transport the household goods of plaintiff from his old home in Sioux City to his new home in Palo Alto, California, with "reasonable dispatch." In compliance with a ruling of the court made on defendant's motion, the petition was amended to allege that the agreement to deliver the goods within a reasonable time was oral and was made with Leo Wilson, the Sioux City agent of defendant, and another employee of defendant. By further amendment plaintiff alleged that before and at the time the shipment was accepted notice was given to said representatives of defendant of the necessity of delivering the goods as soon as possible, for the reason that he and his family had no place to live other than a home which he had purchased in Palo Alto, and was to be furnished with the goods. The petition alleged that in reliance on defendant's agreement to deliver the goods in a reasonable time plaintiff's wife and child came to Palo Alto, but because of the defendant's breach of the contract in its unreasonable and avoidable delay in delivering the goods, plaintiff and his wife and child were compelled to procure lodging and board at a hotel from November 10, 1944, to January 3, 1945, to his expense and damage in the sum of $422.50 for lodging and $140.89 for meals.

Defendant's answer admitted the execution of the written order and the time consumed in the trip as alleged in the petition. Defendant denied any breach of contract or unreasonable delay, any oral agreement, or agreement other than the written contract, and any liability for the hotel expense, and averred that such expense was not a proper measure of damages. It answered that under the written contract it was not liable for any delay or damage caused by authority of law, or by any breakdown or mechanical defects of the vehicle or equipment. It

further answered that it was operating under the rules and regulations of the Office of Defense Transportation, and particularly General Order No. 3, section 501.6, which provided: "(a) No common carrier shall operate any motor truck in over-the-road service unless it is loaded to capacity." It averred that it used all reasonable and necessary diligence in procuring cargo additional to the plaintiff's goods to load to full capacity a van by December 14, 1944.

. In reply plaintiff denied all affirmative defenses alleged in the answer, and further alleged that defendant's truck was loaded to capacity at Sioux City, in full compliance with said General Order No. 3, and should have proceeded directly from Sioux City to its destination, and that in taking said goods to St. Louis, Missouri, it violated sections 501.4(j) and 501.6(b)(2) of the Office of Defense Transportation, prohibiting the taking of a "circuitous route" whose mileage exceeded the mileage of the most direct highway by ten per cent or more, and thereby traveled a twenty-five per cent circuitous route.

It was stipulated that ODT General Order No. 3 (Revised) sections 501.4 to 501.14, inclusive, was in force and effect at all times pertinent, and that either party might introduce in evidence any portion thereof. Plaintiff introduced section 501.10 (b), which provided in substance that no common carrier "shall hold, carry over, store, or warehouse any shipment at any one station, except the final destination of the shipment, for longer than 36 hours * * * except where there is no other common carrier by rail, motor, water, or otherwise, capable of transporting the shipment * * *."

The trial court found that the goods were not being transported with reasonable dispatch during the period of thirty-seven days of storage at St. Louis, and held that defendant was properly chargeable with notice of the pressing needs of plaintiff and his family, and the necessity of reasonable dispatch in delivering the goods, and that it was therefore liable for the expense to which plaintiff was put for hotel lodging for himself and family for thirty-seven days, in the sum of $277.50. The court held that this was the proper measure of damages. Nothing was allowed for money expended for meals.

Plaintiff, with his wife and minor child, had been a resident of Sioux City, Iowa. After his return from military service he entered the School of Medicine at Palo Alto, California, in September 1944. Desiring to live there, he purchased a home on October 5th of that year, which was ready for occupancy on the fifth of the following November. His wife then made arrangements to ship the household goods by van from Sioux City to Palo Alto, and to secure passage for herself and child by plane. Most of the facts are not in dispute. There is substantial evidence amply sustaining the facts herein set out. Through her husband's brother, Leo Wilson, a shipper of property by motor truck, was contacted. He came to her home to look at the property and to estimate the cubage and weight of the load. He estimated the latter at 7,000 pounds. He was told at this time by Mrs. Huff of the necessity of an early and prompt delivery of the goods, since the family would have no home of their own at Sioux City or Palo Alto while the goods were en route. He was a witness for both parties. He testified that the Huffs told him that they wanted the goods moved in a week or ten days and that Mrs. Huff and her child were planning to leave for Palo Alto in order to arrive about the time the goods would arrive. He also testified that he told the Huffs that under normal conditions it would take the truck loaded with their goods from seven to nine days to make the trip from Sioux City to Palo Alto. He did not inform them of any existing abnormal conditions, or that the truck would take a circuitous or indirect route, but he told Mrs. Huff that the goods would be shipped direct to California from her Sioux City residence.. This was before the agreement with defendant was made. Nothing was said about any ODT regulations. While Wilson was engaged in the public carriage of property in Iowa and adjoining states, he was then doing no long-distance hauling, such as would be necessary in this case. He was then and had been for some years an agent of defendant with authority to receive orders and to make contracts for it to transport merchandise and commodities. Plaintiff's brother had first contacted the Bekins Van & Storage Lines and then went to Wilson. He told him four weeks was

too long to wait under the particular circumstances and asked him if he had any connections or agencies that could handle the shipment. Wilson made two contacts but neither was available for the service within sixty days. Wilson testified:

"I then sent a telegram to United Van Lines, Inc. of St. Louis [defendant], asking them if they could pick up a lot of about 7,500 lbs. within about ten days or two weeks time. United Van Lines replied with a wire, stating that the load would be picked up in Sioux City on November 4th."

Plaintiff's brother testified that in the latter part of October Wilson telephoned him that:

"National Van Lines wouldn't be able to handle the load but he had a better arrangement; United Van Lines, a St. Louis concern, would have a van to unload in Des Moines, and it would be the proper size to be fully loaded for this particular shipment, and their movement in and out of Des Moines would be very definite, so Mrs. Robert Huff would be able to make railroad reservations to the coast without unnecessary waiting."

On October 30, 1944, Wilson brought to the Huff home the paper, designated as an "order for services"—four copies of it—which she signed. It apparently was not signed by the defendant, but two copies were sent to it and a third one was retained by Wilson. On November 2, 1944, the defendant's one-and-one-half ton Chevrolet truck, with a load capacity of about 7,000 pounds and a capacity of 1,000 cubic feet arrived at Sioux City. Its driver testified that defendant employed him the day before. He reported to Wilson and the latter sent some of his men to help in packing and loading the goods. He testified that "the Huff load filled my van to capacity." That was also the testimony of Wilson and the Huffs. The van would not hold all of the goods. The father of plaintiff testified:

"Some furniture was left over and was taken to the Wilson place of business and shipped by railway freight. When we saw we couldn't get it all on the truck I phoned Mr. Wilson and he suggested that we sort the furniture *so that we would not*

*keep something here that was needed right away, that would get out on the truck right away, because the other would be slower to go. The less important things were sent by freight."*

Mr. Wilson testified:

"The rest of their household goods were sent by railroad freight *which would take [about] 30 days. I think their main purpose in arranging for this shipment was to get it there in a short period of time,* but I was not aware that their purpose was to have the furniture there immediately when Mrs. Huff arrived."

Mrs. Huff and the father and brother of plaintiff were at the latter's home when the truck was loaded. Each of them testified to talks with the driver; of his inquiry as to the best route between Sioux City and Palo Alto; of his examination and acceptance of road maps showing the route across Wyoming and westward; of his intention to go the next morning directly west from Sioux City over this "northern" route—U. S. Highway No. 20— in order to save mileage. Mrs. Huff testified:

"I asked the driver how long he thought the trip to California would take him. He replied that he would arrive in Palo Alto by Friday, November 10, 1944, and not later than Monday, November 13, 1944. I told him that I was planning to fly out with my year-old child in time to meet the van on November 10th. I left Sioux City with my [year-old] child November 8, 1944 * * *. My furniture and household goods did not arrive in Palo Alto until January 3, 1945. We were unable to occupy our place of residence prior to the arrival of the * * * goods. Our house was unfurnished, and we were without furniture or household goods to put in it. I lived with Mr. Huff and our child at the President Hotel, Palo Alto, from the time we arrived [there] until the * * * household goods were delivered."

The plaintiff was living in a dormitory at Stanford University. Testimony similar to that of Mrs. Huff was given by Huff, senior, and his son Jean. The father testified:

"I asked him [the driver] if his truck was in shape so that he could make the trip. 'Yes,' he said, 'there is no question about it, this truck has a new engine in it and they gave this truck to me and there is no question about getting out there.'"

In the deposition of the driver, taken by defendant, he denies all of this testimony. When the truck was loaded the driver went to Wilson's office and telephoned defendant at St. Louis and received directions to bring his load to St. Louis. He left Sioux City that night or the next morning and arrived in St. Louis on November 5th. Mr. Wilson was present when the telephone direction was received, and learned what it was. He testified:

"I had no other information prior to that time, than that the truck would depart from Sioux City to Palo Alto, California."

The Huffs were not informed that the truck, instead of proceeding directly to Palo Alto from Sioux City, had been routed circuitously through St. Louis. Wilson had not told them, for he testified:

"I don't believe the fact that this shipment would be consolidated with another load was discussed with the Huffs."

The Huffs at Sioux City had no knowledge of the rerouting until word was received from the plaintiff about a week after the goods were due to arrive that they had not been delivered. Upon contacting Wilson the latter advised plaintiff's brother to call Mr. Roer, the defendant's sales manager at St. Louis. The brother did so on November 25th and Roer erroneously informed him that the van was then broken down in Tulsa, Oklahoma, and it would be several days before it was repaired. When Huff, senior, called Roer sometime later he informed him that the goods were in storage in St. Louis and would be loaded and started for Palo Alto in about three days. It was disclosed at the trial, by the deposition testimony of defendant's witnesses, that when the Huff shipment reached St. Louis it weighed 6,730 pounds which was less than eighty per cent

of the capacity of defendant's cross-country van, and therefore further progress had to wait the arrival of sufficient goods to make up the twenty per cent deficiency and complete a full load, as required by the above-mentioned ODT regulation. The Huff goods, which, according to the driver of the cross-country van, occupied about seventy-five per cent of the cubage of the van, was then placed in storage until a cargo weighing 3,160 pounds from Cleveland consigned to Palo Alto arrived and was consolidated with the Huff shipment. After remaining in storage thirty-seven days the coast-bound van left St. Louis on December 15, 1944, with a load of 9,890 pounds, and after a trip of nineteen days arrived and was unloaded at Palo Alto January 2, 1945. Some evidence of defendant's lack of care and diligence in the transportation of the load appears from its manager's testimony that:

"He [driver] had to purchase tires and make repairs on his van while en route * * * with Mr. Huff's furniture *and he had to obtain authority from me before he could purchase or have repairs made to his van. I authorized and approved these repairs.*"

The obtaining of these approvals no doubt contributed to the three-days' delay at Albuquerque in repairing the trailer brakes, and the two-days' delay at Benson, Arizona, when a tire blew out. The evidence, given two or three times by Wilson, was that under normal conditions the trip from Sioux City to Palo Alto by the northern route would take from a week to ten or twelve days, and by the southern route "would not be more than about 2, 3 or 4 days [longer]." Testifying as defendant's witness on cross-examination, as to the time of the trip from Sioux City, Wilson said: "Given the equipment, a reasonable length of time would have been about ten days." There is no testimony in the record that the truck of defendant which was loaded at Sioux City was not mechanically equipped to make the trip to Palo Alto. The contrary is established by the testimony of its driver, and by the testimony of Wilson on cross-examination as defendant's witness, when he said:

"The van which picked up the goods in Sioux City was a ton and one-half truck and was filled to capacity. It was physically capable of moving from Sioux City, Iowa, to Palo Alto, California. If it were to leave Sioux City * * * for Palo Alto * * * a reasonable period of time for it to arrive under normal conditions would be from 10 to 12 days. * * * I am familiar with ODT regulations in force at that time which prohibited a truck or vehicle loaded to capacity, to deviate more than 10% from a direct route to its destination. I think that there was more than a ten per cent deviation if the truck left Sioux City and went to St. Louis and from there the shipment went to Palo Alto."

Defendant in this court assigns errors for reversal as follows: 1. Plaintiff failed to plead what was a reasonable time for the transportation; 2. plaintiff failed to prove what was such reasonable time; 3. the court erred in presuming that the driver of its truck at Sioux City informed defendant of the alleged conversations at the time of loading; 4. the court ignored material evidence in holding that it was "uncontroverted" that the shipment was not being transported with reasonable dispatch during the thirty-seven-days' storage period.

I. In support of its first assigned error that the judgment should be reversed because plaintiff did not plead what was a reasonable time in which to make delivery of the shipment, defendant relies upon language in Wallace-Farmer v. Davis, 199 N. W. 307 (an opinion of this court not contained in the Iowa Reports). This language appears on page 308, and is:

"The shipper is not called upon to show what caused the alleged delay in the shipment, but is under a legal obligation *to plead* and prove *the reasonable time for the transportation of the shipment between the initial and terminal* points of carriage. Turkington v. C., R. I. & P. Ry. Co., 196 Iowa, 304, 194 N. W. 75." (Italics supplied.)

The italicized language was used in a discussion of the law generally with respect to the subject matter of delay in com-

mon-carrier delivery. It was dictum and nothing else. There was no such question in issue in either case—no question of pleading involved. In each case the petition contained an allegation of what was a reasonable time for delivery, but there was no issue as to the necessity of such pleading by the plaintiff. The statement in the opinion that the shipper is under legal obligation to plead the reasonable time for transportation of the shipment is by inadvertence and has no proper place there. This is evident from the opinion as a whole, and from particular statements therein, as:

"In the instant case plaintiff had the burden in the first instance to show the shipment of hogs was unreasonably delayed in transit. *It is the only question in the case.*" (Italics supplied.)

In all cases based on unreasonable delay, the burden is upon the plaintiff to establish that fact, and in doing so he must, ordinarily, prove what would have been reasonable dispatch in making delivery, but this court has never held that he must plead the latter fact.

There is another reason why there is no merit in the assignment. Plaintiff pleaded an unreasonable delay, and defendant, without attacking the petition or raising the point now urged, in any way, alleged in its answer that the shipment went through with reasonable dispatch. By so pleading it put the matter in issue, and the cause went to trial. It cannot now challenge plaintiff's pleading. Of a similar matter, in Grieve v. Illinois Cent. Ry. Co., 104 Iowa 659, 661, 74 N. W. 192, this court said:

"The statement is not as specific as might have been required, had timely objection been made. The answer, however, clearly puts in issue the negligence charged in delay and the failure to exercise care, as it, in terms, denies lack of care, and alleges the delay was occasioned by the intimidation, violence, and interference of strikers and mobs in Chicago, and that the stock was delivered as soon as possible. Having met the issues, indefinitely stated in the petition, the defendant is not in a position to say they were not tendered."

■ II. Assigned errors 2 and 4 may be disposed of together. The evidence was amply sufficient to sustain the court's finding and conclusion that there was unreasonable delay in the delivery of the goods at their destination, particularly with respect to the thirty-seven days during which they were in the warehouse at St. Louis. The court limited its finding of unreasonable delay to this period, although the circuitous routing, and the lack of diligence between St. Louis and Palo Alto, might well have justified the addition of other days of delay. Sixty-one days elapsed between the loading at Sioux City and the unloading at Palo Alto. In support of plaintiff's allegation of unreasonable delay was the testimony of Wilson. He was an experienced truck operator. He had made several trips by motor truck to the Pacific coast. He fixed the reasonable time for the trip, under normal conditions, at from seven to twelve days by the northern route and from two to four days more by the southern route. It is true he testified that sixty-one days was not unreasonable time for the trip, and that under the existing conditions a reasonable time might have been sixty to one hundred twenty days. But with respect to the court's finding, the abnormal conditions all simmer down to the ODT requirement for capacity-loaded trucks. The thirty-seven days of storage is bottomed solely on that rule. But there is no merit whatsoever to that alleged excuse for the storage delay. It is no aid to the defense. Neither this particular regulation nor any other ODT rule required the defendant to wait until December 15, 1944, to send the shipment on its way. No ODT regulation or rule required the trucks to be of any specified capacity. It simply required that a truck, regardless of its capacity, be loaded to capacity. Defendant's truck was loaded to capacity at Sioux City. It could have and should have gone directly west from Sioux City to the west coast. The Huffs were told this would be done and that is what they relied on. No ODT regulation stood in the way of such a trip. It is true there was testimony that this particular truck was not licensed to operate in the states through which the northern route passed. We do not concede that it is a proper defense

for a public common carrier to offer the failure to procure an essential facility and requirement of its business. But there is no evidence that this truck was not duly licensed for passage over the southern route. There was no ODT regulation to prevent the truck from proceeding on its way to Palo Alto promptly on its arrival in St. Louis on November 5th. This would have eliminated the thirty-seven-days' storage.

In addition to the above-noted testimony of Wilson that seven to twelve days would have been reasonable time, there is the testimony of defendant's driver that the truck would meet Mrs. Huff in Palo Alto on November 10th, or the 13th at the latest.

■ Defendant stressed the contract provision that it was required to use only reasonable dispatch. This term is merely a statement of the common-law rule. For many years the statutes of this state have required transportation by railroads to be made with "reasonable dispatch." Under the decisions of this court the burden is upon the shipper to establish the unusual and apparently unreasonable delay, and the burden is then on the common carrier to explain, account for, and justify the delay, consistently with the exercise of ordinary diligence and reasonable dispatch. St. Clair v. Chicago, B. & Q. R. Co., 80 Iowa 304, 305, 45 N. W. 570; Grieve v. Illinois Cent. Ry. Co., supra, 104 Iowa 659, 664, 665, 74 N. W. 192; Tiller & Smith v. Chicago, B. & Q. R. Co., 142 Iowa 309, 316, 317, 120 N. W. 672; McMillan v. Chicago, R. I. & P. Ry. Co., 147 Iowa 596, 599, 600, 124 N. W. 1069; Daoust & Welch v. Chicago, R. I. & P. Ry. Co., 149 Iowa 650, 652, 654, 655, 128 N. W. 1106, 34 L. R. A., N. S., 637; Carr v. Chicago, R. I. & P. Ry. Co., 173 Iowa 444, 445, 447–449, 155 N. W. 840; Bateham v. Chicago, M. & St. P. Ry. Co., 195 Iowa 659, 663, 664, 192 N. W. 818; Wallace-Farmer v. Davis, supra, Iowa, 199 N. W. 307–309.

Plaintiff fully met its burden, and defendant failed to exculpate itself. We cannot disturb the judgment on the ground of lack of evidence to sustain it.

■ III. Defendant complains that nothing supports the court's presumption that the truck driver at Sioux City advised defendant of the alleged conversations he had with the

Huffs at the time the truck was loaded. It is contended that these acts of the driver were outside the scope of his authority. Whether he could vary the terms of the writing which Wilson had procured from Mrs. Huff is a matter we need not pass on. But he was an authorized representative of the defendant, sent by it to Sioux City to load the goods and apparently to take them to California. The defendant gave him the appearance of having such authority. He certainly was not barred from expressing his opinion as to what "reasonable dispatch" under the contract meant and was respecting this trip. Mrs. Huff was justified in placing some reliance on what he said and in informing him of why she wished to know. The notice and knowledge which he and Wilson received from the Huffs were notice and knowledge to the defendant, and it was bound thereby. It was the duty of each of these agents and representatives to impart this information to the defendant. It is presumed that they did so. And the fact that they may not have does not defeat or rebut the presumption. Plaintiff was not required to establish by direct testimony that the knowledge was in fact communicated to defendant. The court was justified in indulging in the presumption complained of. It is a general rule that the knowledge of an agent, gained in the performance of his authorized work or duty and within its scope and reasonable connection, is the knowledge of the one for whom he is acting. Restatement of the Law, Agency, sections 268–282; 2 Am. Jur., Agency, sections 368–370; Laird & Keehner v. McCord, 196 Iowa 972, 976, 977, 195 N. W. 517; Watt v. German Sav. Bk., 183 Iowa 346, 364, 165 N. W. 897.

██ IV. The information above referred to was material and important for another purpose. While the matter is not included in any assignment of error, it was repeatedly urged during the trial that the expense for which recovery was allowed was not a proper measure of damages. But from the knowledge imparted to its representatives the defendant had such notice that it must be held to have anticipated or reasonably should have anticipated that any delay would burden the plaintiff with just such expense as he incurred and pleaded.

Elzy v. Adams Express Co., 141 Iowa 407, 410, 411, 119 N. W. 705; Percy v. Chicago, R. I. & P. Ry. Co., 207 Iowa 889–894, 223 N. W. 879; Wisecarver & Stone v. Chicago, R. I. & P. Ry. Co., 141 Iowa 121, 139, 119 N. W. 532.

Even without considering any alleged oral contract, and limiting defendant's liability strictly to the written "order for services," it is our conclusion that the judgment should be, and it is,—Affirmed.

OLIVER, C. J., and HALE, GARFIELD, MULRONEY, SMITH, MANTZ, and HAYS, JJ., concur.