356 F.2d 718
 DUBUQUE STONE PRODUCTS CO., an Iowa Corporation, Appellant,
v.
FRED L. GRAY COMPANY, a Minnesota Corporation, Appellee.
FRED L. GRAY COMPANY, a Minnesota Corporation, Appellant,
v.
DUBUQUE STONE PRODUCTS CO., an Iowa Corporation, Appellee.
 No. 17804.
 No. 17805.
 United States Court of Appeals Eighth Circuit.
 February 18, 1966.
 
 F. H. Becker, Dubuque, Iowa, made argument for Fred L. Gray Co. and filed brief with Donald F. Pratt, of Townsend, Pratt, Trench, Ericson & MacGregor, Minneapolis, Minn.
 Rolland E. Grefe, Des Moines, Iowa, made argument for Dubuque Stone Products Co. and filed brief with Ross H. Sidney, of Austin, Grefe & Sidney, Des Moines, Iowa.
 Before VOGEL, Chief Judge, and MATTHES and RIDGE, Circuit Judges.
 MATTHES, Circuit Judge.
 
 
 1
 These are an appeal and cross-appeal from a judgment in a suit brought by Fred L. Gray Company (Gray), a Minnesota corporation, against Schueller & Co., Inc. (Schueller) and Dubuque Stone Products Co. (Dubuque), Iowa corporations, in the United States District Court for the Northern District of Iowa, for unpaid workmen's compensation, public liability and automobile insurance premiums on Standard Accident Insurance Company policies issued to Schueller & Co., Inc. Schueller defaulted and has not appealed from the judgment against it. Dubuque appeals from the judgment of $36,057.18, while Gray appeals from that portion of the judgment which fails to include $7,232.60 claimed to be owing to it in retrospective workmen's compensation policy premiums.
 
 
 2
 Diversity of citizenship and the amount in controversy establish jurisdiction. Inasmuch as the parties seemingly agree that Iowa law is controlling as to substantive questions, we, too, recognize the law of that state in disposing of the issues before us.
 
 
 3
 Gray is a general agent of Standard Accident Insurance Company (Standard), which issues workmen's compensation, public liability, personal liability and property damage policies. Coates Insurance Agency, a sub-agent of Gray, issued, to Schueller, the policies covering the period during which the "joint venture agreements" were in existence. Gray has paid Standard $19,667.02 of the amount owing on both initial premiums and additional premiums developed by audit and has received, since the filing of the suit, an assignment of Standard's rights against Dubuque.
 
 
 4
 The theory upon which Gray relies for recovery is that the insurance had been purchased to further joint ventures of Schueller and Dubuque and both are jointly and severally liable for the outstanding premiums. There is little disagreement about the basic facts, many of which are contained in stipulations. For many years prior to 1958, Schueller, primarily a sewer contractor, had purchased materials from Dubuque, a material supplier. Between April and July, 1958, Schueller decided it could successfully bid larger construction projects if it obtained additional capital. Thereupon, Schueller and Dubuque entered into a written agreement, designated a "Joint Venture Agreement", in connection with a project at Offutt Air Force Base, Omaha, Nebraska. This agreement, in summary, contained the following sections:
 
 
 5
 a. A general paragraph describing the job involved.
 
 
 6
 1. A statement that the parties associated themselves "as joint venturers" until the contract be fully performed, all obligations incurred therein fully paid and all payments received thereunder fully disbursed.
 
 
 7
 2. A statement that Schueller was to manage the project and furnish full staff.
 
 
 8
 3. A statement that Schueller would be reimbursed for equipment furnished, at 60% of the then current A.E.D. rates.
 
 
 9
 4. A statement that all equipment was to be rented; none to be purchased.
 
 
 10
 5. A statement that Dubuque Stone was to furnish all funds for use in the performance of the contract up to $200,000.
 
 
 11
 6. A statement that a joint account would be established in the First National Bank of Chicago to handle the money of the venture, all venture monies to be channeled through that account and signature control provided for both parties.
 
 
 12
 7. A statement that C. M. Elrod was selected as manager; provisions for his salary and bonus.
 
 
 13
 8. A provision for insurance of $100,000 on Elrod's life.
 
 
 14
 9. A provision for equal division of profits between Schueller and Dubuque.
 
 
 15
 10. A statement that the agreement was to be binding on successors and assigns.
 
 
 16
 Nine other projects were assumed, under either written or oral agreements, materially differing from the Offutt agreement only in that the subsequent agreements did not contain the $200,000 limitation on the part of Dubuque. There is disagreement among the parties as to whether two other additional projects (known as the Burkburnett contracts) were of the same "joint venture" nature.
 
 
 17
 The first year of their association, Schueller and Dubuque realized a profit of $93,103.70, one-half of which was attributed to each of them. Subsequently, the venture became unprofitable and Dubuque, which had signed indemnity agreements in connection with various contract and performance bonds, was called upon to furnish additional financing. In its 1960 income tax return, Dubuque showed losses of approximately $345,000, due to the joint venture activities. These losses, denominated "joint venture losses" were utilized to claim refunds from the Internal Revenue Service.
 
 
 18
 Before considering the issues raised on this appeal, it should be helpful to review some well known principles of Iowa law with regard to joint ventures. As was succinctly stated in Brewer v. Central Const. Co., (1950), 241 Iowa 799, 43 N.W.2d 131, at 136:
 
 
 19
 "A joint adventure is defined as an association of two or more persons to carry out a single business enterprise for profit; also as a common undertaking in which two or more combine their property, money, efforts, skill, or knowledge. The outstanding difference between a joint adventure and a partnership is that the former usually relates to a single transaction while the latter usually relates to a continuing business. (Citing authorities).
 
 
 20
 "As a rule, a joint adventure is characterized by a joint proprietary interest in the subject matter, a mutual right to control, a right to share in the profits and a duty to share the losses. (Citing authority)."
 
 
 21
 The Iowa court's expression seems to be in accord with the generally recognized and accepted definition and characterization of a joint venture. See, 48 C.J.S. Joint Adventures §§ 1, 2 and 5a; 30 Am. Jur., Joint Adventures, § 6, which contain detailed discussions of the law in this area.
 
 
 22
 Under Iowa law, liability of a member of a joint adventure may be derived from any one of three sources: "First, a direct contract with the creditor suing. Second, on the theory of agency arising under the express or implied right of other members of the project to bind a particular one of the group by contracts within the scope of the `authorized' enterprise. This always depends upon the sufficiency of the circumstances in each case. And, third, when the facts warrant it, this responsibility can be established through the principle of partnership when there is contemplated a mutual bearing of the losses." Bond v. O'Donnell, 205 Iowa 902, 218 N.W. 898, 902, 63 A.L.R. 901 (1928). It need not explicitly be agreed that losses resulting from the venture will be shared. Rather, this can be inferred from other provisions of the contract, the nature of the business, and the relation of the parties to the business transacted. Brewer v. Central Const. Co., supra, 43 N.W.2d at 136; Bond v. O'Donnell, supra, 218 N.W. at 902.
 
 
 23
 Dubuque does not challenge the fact that all of the projects, with the exception of the Burkburnett jobs, were joint ventures on the part of Schueller and Dubuque. It does, however, contend: (1) that it is not liable for the "unpaid insurance premiums because its agreement with Schueller was to provide financing with an express limitation of $200,000, on the amount thereof" and Gray's knowledge of this limitation precludes recovery of the premiums due; and (2) that "[t]he lower court's finding that Schueller and Dubuque Stone agreed to perform the Burkburnett contracts in the same manner and on the same terms as other joint ventures is not supported by the record evidence."
 
 
 24
 From the very nature of these contentions it is apparent that the district court was basically confronted with fact questions. In this situation, our review must be keyed to two fundamental principles of law. First, in examining the evidence, we must take the view which tends to support the findings and conclusions of the trial court, and we must accept all inferences which reasonably tend to support its conclusions. Minnesota Amusement Co. v. Larkin, 299 F.2d 142, 146 (8 Cir. 1962); United States v. Skolness, 279 F.2d 350, 352-353 (8 Cir. 1960); Barryhill v. United States, 300 F.2d 690, 693-694 (8 Cir. 1962); American Universal Ins. Co. v. Dykhouse, 326 F.2d 694, 695 (8 Cir. 1964). Second, findings of fact are presumed to be correct and may not be set aside unless they are clearly erroneous. F.R.Civ.P. 52(a); United States v. Skolness, supra; Barryhill v. United States, supra; American Universal Ins. Co. v. Dykhouse, supra.
 
 
 25
 With regard to Dubuque's first contention, it is undisputed that the $200,000 limitation appeared in only the first joint venture agreement (dealing with the Offutt project) and was intentionally left out of all subsequent joint venture agreements. There was also uncontroverted evidence that Dubuque provided financing, and claimed joint venture losses on its income tax returns, in excess of $200,000. This, along with other evidence, was ample to warrant the inferential finding by the court that Dubuque's joint venture liability was not limited to $200,000.[1]
 
 
 26
 A subsidiary part of this issue, concerning the extent of Dubuque's liability, is its claim that "[t]he knowledge of Russell Scherrer, proprietor of the Coates Agency, and sub-agent for Fred L. Gray Company, of the express limitation of $200,000 on Dubuque Stone's financing agreement, is binding upon Gray and precludes any recovery for the premiums on Schueller's insurance contracts".
 
 
 27
 Dubuque relies upon the general rule that "the knowledge of an agent gained in the performance of his authorized work or duty and within its scope and reasonable connection is the knowledge of the one for whom he is acting." Huff v. United Van Lines, Inc., 238 Iowa 529, 28 N.W.2d 793, 799 (1947). The testimony supporting Dubuque's assertion that the claimed limitation had been disclosed, is that of Dubuque's president, Mr. Spahn:
 
 
 28
 "* * * Mr. Scherrer was present during some of these conversations in which we were deciding the fact that we would set up this $200,000.00 worth of financing for Schueller & Co., I would say that this occurred on several occasions. * * * At those times we mentioned the fact that we were going to put up $200,000.00 in financing for the Schueller and Company and that that money would be made available to him for the purpose of carrying on additional jobs and we felt that by putting up that money he could get an additional bond. Then in a later conversation we were told that we would have to put up the entire sum of $200,000.00 and have it on deposit at all times or we could elect to become an indemnitor and in becoming an indemnitor then we would only have to put up the money that was required from time to time with a maximum of $200,000.00."
 
 
 29
 While this testimony does lead to the conclusion that Mr. Scherrer was informed of the $200,000 "financing" made available by Dubuque, it does not necessarily follow that Mr. Scherrer "knew" that $200,000 was to be the absolute limit of Dubuque's liability on the joint ventures. Such an interpretation of the knowledge had by Mr. Scherrer (who had died prior to this litigation) is particularly unpalatable in view of the fact that the record, as a whole, does not substantiate Dubuque's contention that its liability was limited to $200,000. Since Dubuque's liability was not so limited, there is no reason for reading into Mr. Spahn's testimony the implication that Mr. Scherrer sold the policies in question knowing that Dubuque's total joint venture liability was subject to a $200,000 restriction.
 
 
 30
 The court found, contrary to Dubuque's second contention, that the Burkburnett contracts also were joint ventures. There was evidence to warrant the inference that this was the understanding of the parties, that funds derived from these jobs were commingled with funds from other joint ventures, and that reports regarding these projects were given to Dubuque. Although Dubuque's president strenuously urged that the Burkburnett projects were not joint ventures, the evidence, as a whole, convincingly supports the trial court's finding to the contrary.
 
 
 31
 Having in mind the scope of our review in this court-tried case, as enunciated, supra, we conclude that there is no basis in fact or law for disturbing the court's finding with regard to either of the two major questions at issue here.
 
 
 32
 Additionally, it is suggested by Dubuque that "Fred L. Gray Company was not the real party in interest so as to enable it to bring suit * * * to recover allegedly unpaid insurance premiums of Schueller which by the terms of the policies were due Standard Accident Insurance Company. The insurer-principal was the proper party to enforce such liability, if any." In essence, Dubuque's theory is that Gray is not the real party in interest, since Gray was not a party to the insurance contract between Schueller and Standard. Dubuque contends that, at best, Gray might properly have been classified as a representative of Standard for purposes of this suit. However, Dubuque insists that, since Gray at no time alleged that it was suing in a representative capacity, "[it] is now too late to do so." Dubuque further avers that Standard's assignment to Gray, subsequent to filing but prior to trial, did not improve Gray's status.
 
 
 33
 Gray's counter arguments are (1) that it is the real party in interest, and (2) that Dubuque has waived the objection by failing to raise the issue by motion or answer.
 
 
 34
 In considering the effect of the assignment we first look to F.R.Civ.P. 17(a), which declares that: "Every action shall be prosecuted in the name of the real party in interest * * *". See also, 6 Am.Jur.2d Assignments, § 131, p. 313, wherein it is said: "Rule 17(a) of the Federal Rules of Civil Procedure, which provides that every action shall be prosecuted in the name of the real party in interest, with certain exceptions relating to personal representatives, has been applied in the federal courts with respect to suits in his own name by an assignee who is found to be the real party in interest."
 
 
 35
 In diversity cases, state substantive law is consulted to determine whether an assignee qualifies as a real party in interest under Rule 17(a). See Hoeppner Const. Co. v. United States, 287 F.2d 108, 111 (10 Cir. 1961); Wright v. Schebler Co., 37 F.R.D. 319, 321 (D.C. S.D.Ia.1965); 6 Am.Jur.2d, Assignments, § 131. The relevant Iowa law is found in 32 Ia.Code Anno. § 539.3 which provides that an open account of sums of money due on contract may be assigned, and the assignee will have a right of action thereon in his own name, subject to such defenses and counterclaims as the debtor would have had against the assignor before notice of the assignment is given the assignee.[2]
 
 
 36
 One of the basic purposes of F. R.Civ.P. 17(a) is to protect the defendant from further unnecessary litigation.
 
 
 37
 "If the judgment, if any, by the plaintiff will protect the defendant from future annoyance or loss, and where, as against the parties suing, the defendant can urge any defenses he could make against the real owner of the claim, then there is an end of the defendant's concern as to the protection he is afforded by having the claim prosecuted by the real party in interest. Blair v. Espeland, 231 Minn. 444, 43 N.W.2d 274." United States v. Tyler, 220 F.Supp. 386, 395 (D.C.N.D.Ia.1963).
 
 
 38
 Turning to the assignment in this case, Standard unequivocally and unconditionally sold, assigned and transferred to Gray "any and all claims, demands or causes of action, if any, which it has, may have or may in the future have against Schueller and Co., Inc. and Dubuque Stone Products Co. on account of premiums, including retroactive premiums, due or claimed to be due on account of said policies of insurance written by the undersigned through Fred L. Gray Company as its general agent and/or through Coates Insurance Agency as sub-agent for Fred L. Gray Company". In light of this assignment, there can be no basis for arguing that Gray did not acquire, and does not now own, any cause of action which accrued to Standard by reason of the issuance of the insurance policies.
 
 
 39
 We cannot accept Dubuque's argument that the assignment was invalid because it was made after this suit had been filed. The assignment occurred after filing, but before trial, and Dubuque suffered no prejudice therefrom, since at, and from, the time of filing Gray was a real party in interest as to $19,667.02, which it had previously paid to Standard on Dubuque's account. It should also be noted that Gray's first complaint only alleged that it was entitled to that $19,667.02. Standard's subsequent assignment merely conveyed its cause of action to Gray, thereby preventing a later suit by Standard. The assignment did not cause Dubuque to lose the right to assert, against Gray, any defenses which it could have asserted against Standard and, in fact, the record discloses that Dubuque fully availed itself of this right.
 
 
 40
 Although there is some merit in Gray's claim that Dubuque waived the right to complain of Gray's capacity by failing to timely object by motion or answer as required by Rule 9(a) F.R.Civ.P., we need not make a definitive determination of this question because we have found that Gray is the real party in interest, within the meaning of Rule 17(a).
 
 
 41
 This brings us to Gray's cross-appeal, which presents the question whether the court erred in failing to include in the judgment an additional $7,232.60 in retrospective premiums claimed to be due on a workmen's compensation policy which was effective from March 15, 1960, to August 27, 1960, the date of cancellation.
 
 
 42
 Exhibits explaining and determining the retrospective premiums were admitted into evidence and two witnesses testified, in detail, as to the meaning of a "retrospective" premium[3] and the computation thereof under this policy. A retroactive, or retrospective, premium is merely one which is computed, after the termination of the policy, on the basis of the insured's experience during the policy term; in effect, it constitutes a retrospective premium adjustment.
 
 
 43
 Although the instant policy was a "three-year retrospective" one and final adjustment would ordinarily await the expiration of the three years, the final cancellation of this policy, within a few months after its issuance, necessitated an immediate final audit, which disclosed that the additional $7,232.60 was owing.
 
 
 44
 Unfortunately, the trial court did not, in its findings of fact and conclusions of law, indicate why it refused to allow the amount due on the retrospective premium; in fact, the court completely ignored this item in its findings and conclusions. Not only can we find no evidence justifying the court's failure to award judgment for the amount of the retrospective premium, but, to the contrary, the only evidence on this issue stands unrebutted and proves conclusively that the additional "retrospective" premium is due and owing from the joint venturers, in the amount stated.
 
 
 45
 Accordingly, the judgment is vacated and the cause is remanded, with directions to the trial court to enter another judgment in favor of Gray in the amount of $43,289.78, plus appropriate interest.
 
 
 
 Notes:
 
 
 [1]
 Although the court did notexplicitly make such fact finding, it must have inferentially reached that conclusion, since Dubuque had paid out more than $200,000 prior to the bringing of this suit, in which the court allowed a further recovery against Dubuque for $36,057.18.
 
 
 [2]
 Rule 7 of the Iowa Rules of Civil Procedure is to the same effect, providing: "The assignment of a thing in action * * shall be without prejudice to any defense, counterclaim or cause of action matured or not, if matured when pleaded, existing against the assignor in favor of the party pleading it."
 
 
 [3]
 Mr. Reimann, president of Fred L. Gray Company, testified: "Retrospective rating is used * * * generally on larger size risks, and it is used to make the final premium developed on the policy directly in proportion to the loss experience developed by the company carrying the insurance on that particular policy. If the loss experience is very favorable on (sic) the company, the insured can receive a substantial refund or credit. If the loss experience is very poor the insured is liable for additional premium to make up a portion of that loss subject to certain minimums and maximums."